**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **JOSEPH SKIRCHAK AND BARRY ALDRICH, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **Civil Action No.: 05-11362 MEL** |
| **DYNAMICS RESEARCH CORPORATION, A Massachusetts corporation,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS COMPLAINT AND COMPEL PLAINTIFFS' COMPLIANCE WITH THE DISPUTE RESOLUTION PROGRAM**

Dynamics Research Corporation ("DRC") submits this Memorandum of Law in Support of its Motion to Dismiss Complaint and Compel Compliance with the Dispute Resolution Program (the "Program") which specifically requires the plaintiffs to resolve the claims asserted in the Complaint through the Program in lieu of a judicial forum. In December 2003, DRC implemented the Program and notified its employees, including the plaintiffs, of its terms. The plaintiffs even assisted in the review of the Program and its company-wide dissemination. They were employees prior to the Program's implementation and remained employees well after the implementation of the Program, and thereby assented to be bound by its terms. As a term of the Program, each of the plaintiffs, individually, agreed to waive his rights to a judicial forum to adjudicate "all legal disputes," specifically including statutory claims, and agreed to comply with

a mandatory three-step dispute resolution process, which could culminate in binding arbitration if disputes are not resolved at an earlier stage of the Program.

The contract between the plaintiffs and DRC is a valid agreement that requires each of the plaintiffs to adjudicate his claims through the three-step process, and not in this judicial forum. The causes of action set forth in the Complaint fit squarely within the Program, and yet the plaintiffs did not comply with the Program. The plaintiffs must not be permitted to ignore their contractual obligations. Pursuant to the authority granted this Court by the Federal Arbitration Act, the Court must dismiss the Complaint[1] and order each of the plaintiffs to comply with his contractual obligation to adjudicate his claims in accordance with the terms of the Program.

**RELEVANT FACTUAL BACKGROUND**

**Dynamics Research Corporation**

DRC is a publicly held company headquartered in Andover, Massachusetts. DRC is a leading provider of professional services and high technology products whose primary customer is the United States Government. DRC delivers engineering, logistics, and information technology services and precision manufactured products that enhance the performance and cost effectiveness of its customers' mission critical systems. DRC currently has 1960 employees working numerous offices and customer locations nationwide.

**DRC's Dispute Resolution Program**

DRC uses the Dispute Resolution Program to resolve all workplace disputes. A true and complete copy of the Program is annexed to the Affidavit of Joseph LeBlanc ("LeBlanc

---

1 When all the claims asserted in the complaint are subject to arbitration, it is proper for the court simply to dismiss the case. Wright & Miller Federal Practice and Procedure: Civil 3d §1350; *Whitney v. Peregrine Sys. Inc.*, (D.C. Ill. 2001) 2001 WL 1607464.

Affidavit") as Exhibit 3. The Program binds all employees, including managers and executive officers, to utilize the Program for all disputes between DRC and individual employees (except for disputes which the employee desires to bring before the EEOC, MCAD, or the Board of Industrial Accidents) for the mutual benefit of both. As a result, resort to this Program, in lieu of a court of law, is mandatory, requiring *all* DRC employees to adjudicate *any* work-related issues by following the Program's procedures. (LeBlanc Affidavit, Ex. 3, p. 16). The Program's terms notify employees that the Program "creates an exclusive procedural mechanism for the final resolution of all disputes falling within its terms" (*Id.*), and that "all disputes…shall be finally and conclusively resolved under this Program." (LeBlanc Affidavit, Ex. 3, p. 18). The Program's rules clearly communicate the Program's breadth, stating that it "applies to and binds" DRC and every employee, and "applies to any dispute between the employee and [DRC]." (*Id.*) The term "dispute" is broadly defined to mean "any dispute or controversy including all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or at law or in equity, between persons and entities…." (LeBlanc Affidavit, Ex. 3, p. 16).

The Program is a three-step process, culminating in final and binding arbitration, if necessary, for any legal right, including statutory claims. (LeBlanc Affidavit, Ex. 3, pp. 5-6 ). The first step is the Management Review Procedure, in which employees must bring any complaint to DRC's attention in accordance with a long-standing Problem Resolution Policy. (LeBlanc Affidavit, Ex. 3, p. 5). If the Management Review Procedure does not resolve the employee's concern, and if the issue involves a legally protected right, the next step requires DRC and the employee to mediate the dispute in a non-binding mediation. (*Id.*) If the mediation does not produce a mutually-acceptable result and if either party wishes to further pursue the

matter, the Program requires that the employee and DRC submit their dispute to final, binding arbitration. (LeBlanc Affidavit, Ex. 3, pp. 5-6). The Program and the interpretation of its contractual terms are expressly governed by the Federal Arbitration Act (9 U.S.C. § 1, *et seq.*) (the "FAA"). (LeBlanc Affidavit, Ex. 3, pp. 16, 19). The Program and its procedures, to which all DRC employees are subject, do not change any employee's substantive rights, but rather simply change the forum in which disputes are adjudicated, for a quicker, more cost-effective result. The Program provides:

> [T]he substantive legal rights, remedies, and defenses of all Parties are preserved. In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all individual relief, legal or equitable, including punitive damages, which a Party could obtain from a court of competent jurisdiction on the basis of the claims made in a proceeding. (LeBlanc Affidavit, Ex. 3, p. 19).

The expressed purposes of the Program are entirely consistent with the objectives of the courts in enforcing alternative dispute resolution programs. The Program provides that:

> "The Program offers many advantages. It allows you and DRC to resolve differences from minor everyday problems to large scale-legal issues, in ways that are:
>
> - Constructive – minimizing impact on work relationships and reputations;
> - Swift – taking days, weeks or months instead of years;
> - Confidential – resolving problems at the lowest possible level of involvement;
> - Simple – resolving problems at the lowest possible level of involvement;
> - Realistic – recognizing that different people and different problems require different solutions;
> - Inexpensive – avoiding or holding down all parties' legal expenses; and
> - Equitable – providing many procedures for resolving problems objectively, using an independent neutral third party – a professional independent mediator or arbitrator – if one is needed.
>
> Dealing with conflicts quickly and appropriately, increases understanding among everyone involved, reduces workplace tension, opens up communication and enhances teamwork. DRC's goal is to resolve disagreements when they first occur, or as soon as possible after that. We believe the benefits of this Dispute Resolution Program are beneficial to all employees and DRC." (LeBlanc Affidavit, Ex. 3, p. 4).

**The Rollout And Implementation Of The Program.**[2]

DRC gave all of its employees ample notice of the Program's implementation by communicating its terms and its mandatory applicability to all employees and all disputes, on multiple occasions, over the course of many months, using the same procedures (email and internal newsletters) DRC ordinarily uses to communicate with employees about new employment policies, or changes in the terms and conditions of their employment. (LeBlanc Affidavit, ¶ 3). Employees were given the details of the Program one week prior to its implementation, given opportunities to email questions or speak with a human resources representative regarding the Program's terms, received a Company newsletter detailing the Program, and certainly had opportunity to reject the Program, if they chose to reject it.

Prior to implementation, on November 14, 2003, DRC sent an email to every General Manager, including the plaintiffs, announcing the Program along with a copy of the Program rules, a thorough written explanation of the Program, and a cover memorandum further detailing the Program. (LeBlanc Affidavit, ¶ 4). The memorandum clearly stated that a **"mandatory" "multi-step"** Program would be going into effect on December 1, 2003, and that the Program was "non-discretionary and applicable to **all workplace disputes** between DRC, applicants for employment at DRC, and DRC's employees, including DRC's officers and managers." (LeBlanc Affidavit, Ex. 1) (emphasis added).

Next, on November 25, 2003, DRC sent an email or a hard copy notice to every employee, again including the plaintiffs notifying them of the implementation of the Program. (LeBlanc Affidavit, ¶ 5). The notice contained a copy of the Program, a thorough written

---

2 For a detailed discussion of the ample notice DRC gave to its employees regarding the implementation of the Program, please see the LeBlanc Affidavit, ¶¶ 3-12.

explanation of the Program, as well as a memorandum which also thoroughly explained the Program. (LeBlanc Affidavit, ¶ 5). The memorandum urged employees to contact their HR representative with any questions about the Program or email questions to an email address created specifically for questions about the new program: askdrp@drc.com. (LeBlanc Affidavit, Ex. 2).[3] To further insure that all employees understood and accepted the Program, as part of the packet of information DRC sent to all employees, it included a "Frequently Asked Questions and Answers" section of the Program. (LeBlanc Affidavit, Ex. 3, pp. 13-15).

In addition to the memoranda, the written explanation that was disseminated with each copy of the Program clearly and completely explained the scope of the Program and that it was binding on all employees and covered all disputes. The written explanation put employees on notice that:

> 1) **"You must use these procedures in order"** (emphasis included);
>
> 2) "all employees of Dynamics Research Corporation…are automatically covered to the fullest extent provided under applicable law by continuing employment with DRC after the effective date of the Program"; and
>
> 3) **"If you file a lawsuit, DRC's attorney will go before the judge, tell the judge of the DRC Dispute Resolution Program, and ask that the case be dismissed and sent back to the DRP Program."** (emphasis added) (LeBlanc Affidavit, Ex. 3, pp. 5, 6, 13).

DRC also informed its employees of the new Program through its internal newsletter entitled *Concerning You*. (LeBlanc Affidavit, ¶¶ 7-10). This newsletter is distributed monthly. (LeBlanc Affidavit, ¶ 7). The front page article in the January, 2004 edition of *Concerning You* was entitled "Dispute Resolution Program (DRP)." (LeBlanc Affidavit, Ex. 4). Giving employees further notice of the new Program, the article repeated the admonition that the new

---

3 A number of DRC employees used this email address to have their questions about the Program answered. (LeBlanc Affidavit, ¶ 5).

program went into effect on December 1, 2003 and is applicable to "all workplace disputes between DRC…and all of its employees, including officers, managers, supervisors, applicants, and employees." (*Id.*) The article went on to explain the procedures of the Program and notified employees that the Program "require[s] that you seek resolution of such rights and complaints by following the procedures of the program." (*Id.*) The article also reiterated that questions should be directed to an HR Representative or the specially-created email address, askdrp@drc.com, and informed employees that further copies of the Program and written description could be found on DRC's Intranet. (*Id.*) DRC continued to remind employees about the new Program by including articles about it in the February, 2004 and November, 2004 editions of *Concerning You* (February, 2004 edition stating that "a suit brought in court that should have been addressed under the [Program] will be subject to a motion to remove the dispute from the court and have it placed under the [Program] for resolution") (LeBlanc Affidavit, Exs. 5 and 6). DRC has often used *Concerning You* to notify employees about new policies or other changes to the terms and conditions of their employment. (LeBlanc Affidavit ¶ 8).[4]

Acceptance of the new program was expressly stated to be a condition of continued employment at DRC: continued employment after the Program's implementation (one week later) constituted assent to be bound by the Program. (LeBlanc Affidavit, Ex 3, p. 6 ("All employees of Dynamics Research Corporation and its companies, subsidiaries and adopting affiliates are automatically covered to the fullest extent provided under applicable law by continuing employment with DRC after the effective date of the DRP")). The plaintiffs were

---

4 Exemplifying this is that the other article on the front page of the January, 2004 edition of *Concerning You*, was about a new compensation program in which every employee would receive a new job title and a new salary grade. Plaintiff Joseph Skirchak authored that article. (LeBlanc Affidavit, ¶ 8).

employees at the time the Program notices were delivered and remained employees after the effective date, and therefore assented to the Program.

**Plaintiffs Were On Notice That All Disputes Must Be Resolved In Accordance With The Program**

The plaintiffs were on notice that the Program was being implemented. In fact, both were in positions that allowed them to be familiar with DRC's method of implementing personnel policy changes, and specifically, that this change would occur. Joseph Skirchak worked in the Human Resources Department (the very department that developed the Program) as Director of Compensation from April, 2001 until he resigned effective October, 2004. (LeBlanc Affidavit, ¶ 12). As Director of Compensation, Mr. Skirchak worked at a high level within DRC's Human Resources Department, and understood the creation and implementation of new policies that changed the terms and conditions of employment. (*See* LeBlanc Affidavit, ¶ 13). The importance of Mr. Skirchak's position in the Human Resources Department, and the fact that his position afforded him a clear understanding of how new policies were created and communicated to employees, combined with the ample notice he and all employees received about the Program, placed Mr. Skirchak on notice that the new Program was in effect, that it covered the claims at issue in this case, and that he was bound by it. In fact, because of his position as a manager, Mr. Skirchak received at least one preliminary copy of the Program for review, and the final copy of the Program and written explanation as well as both memoranda explaining the Program, as he received both packets of information which DRC disseminated on November 14th and 25th, 2003.

During his tenure at DRC, Mr. Skirchak worked directly with John Wilkinson, DRC's former Vice President of Human Resources. (LeBlanc Affidavit, ¶ 12). Mr. Wilkinson authored the memos accompanying the dissemination of the Program, which explained the Program to

every manager and employee. (*Id.*) By working so closely with Mr. Wikinson, Mr. Skirchak certainly had ready access to Mr. Wilkinson should he have desired detailed information about the Program or its terms and general applicability.

Mr. Skirchak was also responsible for the development and implementation of the new compensation program discussed in the January, 2004 edition of *Concerning You*. (LeBlanc Affidavit, ¶ 13). DRC and Mr. Skirchak chose to inform DRC's workforce about his project by using *Concerning You,* which DRC has often used to communicate such changes in employment policies. (*Id.*) For the same reason, DRC also utilized *Concerning You,* among other methods, to give employees notice of the Program. (LeBlanc Aff., Exs. 4-6). Mr. Skirchak cannot genuinely claim that he was not aware of the Program, its terms, and its mandatory applicability to him and the claims he has asserted in this action.

Like Mr. Skirchak, Barry Aldrich, the other named plaintiff in this action, received ample notice about the implementation of the Program and its terms. DRC hired Barry Aldrich in 1987 as Senior Contracts Administrator. (LeBlanc Affidavit, ¶ 14). Mr. Aldrich was working as DRC's Vice President and General Manager when he resigned effective November 12, 2004. (*Id.*) Because he worked as a General Manager, Mr. Aldrich received both the November 14, 2003 and November 25, 2003 packets of information introducing the Program and explaining its terms and conditions. Upon receiving the draft of the Program on November 14, 2003, Mr. Aldrich reviewed and commented on the Program, noting certain typographical errors, but not objecting to the Program. (*Id.*) Thus, Mr. Aldrich, too, had abundant notice of the new Program, its terms, and its broad applicability to him and the claims he has asserted in this action.

**The Complaint**

Plaintiffs have brought this class action, asserting two claims for relief: 1) a violation of M.G.L c. 151 §§ 1A and 1B (the "State Claim); and 2) a violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (the "FLSA Claim"). Both of these claims are derived from an alleged DRC practice or policy pursuant to which it allegedly applied leave time to exempt employees who worked less than 40 hours per week. The plaintiffs also allege that DRC had a practice of deducting from exempt employees' final paychecks any negative amounts of leave time. This alleged practice, plaintiffs claim, was a violation of both state and federal laws. These statutory claims are clearly covered by the broad terms of the Program, and must, therefore, be resolved in accordance with the mandatory procedures of the Program.

## ARGUMENT

### THE CLAIMS ASSERTED IN THE COMPLAINT MUST BE RESOLVED PURSUANT TO THE PROGRAM, AND NOT IN THIS COURT OF LAW. THE COURT MUST DISMISS THE COMPLAINT AND COMPEL COMPLIANCE WITH THE PROGRAM.

Pursuant to Section 4 of the FAA, DRC is entitled to an order compelling the parties to comply with the Program.[5] Section 4 of the FAA provides, in pertinent part:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition. . . the [court] . . . for an

---

[5] Pursuant to the express terms of the Program, this matter is governed by the Federal Arbitration Act. The Program provides, "The Act [Federal Arbitration Act] shall apply to this Program [Dispute Resolution Program], the Rules, and any proceeding under the Program or the Rules, including any actions to compel, enforce, vacate or confirm proceedings, awards, orders of an arbitrator, or settlements under the Program or the Rules." (LeBlanc Affidavit Ex. 3, p. 19). The Federal Arbitration Act creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act. *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 24-35 (1983) (affirming a lower court's granting of defendant's motion to stay and compel arbitration.) Moreover, while Massachusetts has a similar arbitration act (Massachusetts Arbitration Act ("MAA") M.G.L. ch. 215), the FAA displaces any state law, including the MAA, that "(i) affects the validity, enforceability, and interpretation of the agreement to arbitrate...or (ii) would in any way limit the broad principle of arbitrability of private agreements to arbitrate." *Baxter Health Care Corp. v. Harvard Apparatus Inc.* 35 Mass. App. Ct. 204, 205 n. 2 (1993).

order directing that such arbitration proceed in the manner provided for in such agreement.

Where, as here, a court is faced with a motion to compel compliance with a dispute resolution program or agreement, including meditation and/or binding arbitration,[6] the court must decide two issues: (1) Did the parties agree to submit the claims at issue to arbitration; and (2) Can the statutory right to file in court be waived in favor of arbitration? If the court answers both issues in the affirmative, as it must in the instant case, the court is required to order compliance with the dispute resolution program. *See Gilmer v. Interstate/Johnson Lane Corporation*, 500 U.S. 20, 26 (1991). In this case, it is undeniable that the parties agreed to resolve **all claims arising from their employment, including statutory claims,** through the Program. (LeBlanc Affidavit, Ex. 3, pp. 16, 18). It is now well established that parties can be compelled to arbitrate statutory claims, such as those set forth in the plaintiffs' Complaint. Therefore, the plaintiffs must be compelled to honor their obligations under the Program and adjudicate their claims according to the procedures set forth in the Program.

**1. The Parties' Agreement to be Bound by the Terms of the Program is Valid and Enforceable.**

The first step in determining whether to grant a motion to compel compliance with a dispute resolution program, is to confirm that the agreement is valid and enforceable. Here, the plaintiffs and DRC voluntarily entered into a mutually binding agreement to adjudicate all legal claims in an alternate forum. The plaintiffs and DRC contracted to utilize a mandatory three-step process in lieu of resort to the courts. With full notice of the terms of the Program, the plaintiffs

---

6 The FAA defines "arbitration" as any process that will settle the controversy. 9 U.S.C § 2. Because the parties agreed to follow the three-step Program, including both non-binding mediation and binding arbitration, the term "arbitration" in this brief will refer to all portions of the Program: the Management Review Procedure, mediation, and arbitration. Courts interpret the enforceability of dispute resolution programs utilizing the same analysis as when interpreting the enforceability of agreements to arbitrate. *See Caley v. Gulfstream Aero Corp.*, 333 F.Supp. 2d 1361 (D. Ga. 2004); *Kellog, Brown, & Root v. Bragg*, 250 F. Supp. 2d 664 (D. W. Va. 2003); *Owen v. Mbpxl Corp.*, 173 F. Supp. 2d 905 (D. Iowa, 2001).

enjoyed the benefit of the bargain when they continued their employment with DRC for almost an entire year after entering into an agreement with DRC to be bound by the terms of the Program. (LeBlanc Affidavit ¶ ). They cannot now avoid their contractual obligations to adjudicate their claims in accordance with the Program.

**2. The Terms of the Program Preserve the Plaintiffs' Substantive Rights and Merely Change the Adjudicatory Forum.**

By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only agrees to resolve the issues in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration. *Wilko* v. *Swan,* 346 U.S. 427, 435-36 (1953). That is certainly true in this instance. The Program's language does not limit the substantive rights of any employee seeking to vindicate his or her statutory rights. In fact, it preserves all of those substantive rights.[7] Section 8B of the Program provides that:

> **Other than as expressly provided herein, the substantive legal rights, remedies and defenses of all Parties are preserved. In the case of arbitration, the arbitrator shall have the authority to determine the applicable law and to order any and all individual relief, legal or equitable, including punitive damages, which a party could obtain from a court of competent jurisdiction on the basis of the claims made in a proceeding.** (LeBlanc Affidavit, Ex. 3, p. 19) (emphasis added).

In the "Most Frequently Asked Questions" section of the Program, the following question and answer appear:

> Q. 10 Does that mean I am limited in my recoveries by arbitration?

---

7 The one procedural right which employees waive under the Program is their right to pursue a class action as a means of redressing individual grievances. Courts who have already examined this issue have held that an arbitration agreement, pursuant to which an employer sought to compel arbitration of FLSA overtime claims, is not invalid on the grounds that employees are unable to proceed collectively with regard to their FLSA claims, even though the FLSA explicitly provides for class action suits. *Carter v. Countrywide Credit Industries*, 362 F.3d 294, 708-709 (5th Cir. 2004.) Section 4 of this memorandum discusses the enforceability of the waiver of class actions expressly set forth in the Program.

> A. **No.** The arbitrator has the same authority as a judge or jury in making awards or granting relief to an individual employee. (LeBlanc Affidavit, Ex. 3, p. 15) (emphasis in original).

**3. The Program is Certainly Broad Enough to Encompass Plaintiffs' FLSA and State Law Claims.**

The claims contained in the Complaint fit squarely within the terms of the Program. In Section 10, the Program provides, in the broadest of terms, that "the Program shall be the exclusive, final, and binding method by which Disputes are resolved." (LeBlanc Affidavit, Ex. 3, p. 20). Disputes mean **"any dispute or controversy including all legal and equitable claims,...whether under statute or regulation...between persons and entities bound by the Program."** (LeBlanc Affidavit, Ex. 3, p. 16) (emphasis added). Clearly, the Program, culminating in arbitration, is the exclusive remedy for the statutory claims asserted in the Complaint, and the plaintiffs should be ordered to comply with the Program.

Even if there were a scintilla of doubt as to whether the Program encompasses the plaintiffs' claims, which there cannot reasonably be, there is a strong federal policy favoring arbitration. *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Therefore, any doubt over whether a particular dispute is covered by an arbitration agreement should be resolved in favor of arbitration. *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 650, (1986). Massachusetts law is the same. *Myrick v. GTE Main St., Inc.*, 73 F. Supp. 2d 94, 96 (D. Mass. 1999) (Lasker, D.J.) ("a healthy regard for the federal policy favoring arbitration directs that as a matter of federal law, any doubts concerning the arbitrable issues should be resolved in favor of arbitration) (internal quotations and citations omitted); *Mugnano-Bornstein v. Crowell*, 42 Mass. App. Ct. 347, 350 (1997). Moreover, since the enactment of the FAA (which controls the Program), and, in particular, since the Supreme Court's decisions in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26

(1991) (an ADEA case) and its progeny, federal courts have recognized the important role arbitration plays in resolving individual employment disputes, including statutory claims, and have resolved any reasonable ambiguity in favor of arbitration.[8] *Gilmer*, 500 U.S. at 26 (enforcing an arbitration agreement with respect to an ADEA claim) ("[I]t is now well settled that statutory claims may be the subject of an arbitration agreement, enforceable by the FAA."); *see also Myrick,* 73 F. Supp. 2d at 95 (enforcing an arbitration agreement and compelling arbitration of a M.G.L. c. 151B employment claim).

Should the plaintiffs resist arbitration alleging that the FLSA and M.G.L. c. §151, § 1A are not arbitrable, they face an uphill battle.[9] A resisting party **must** establish that Congress did not intend for the statutory rights at issue to be arbitrable. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*, 473 U.S. 614, 628 (1985) ("We must assume that if Congress intended the substantive protection afforded by a given statute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history"). Not only does the burden rest with the resisting party (*Gilmer*, 500 U.S. at 26), but the resisting party

---

8 In fact, even prior to *Gilmer*, in a trio of cases decided in the 1980's, the Supreme Court continually recognized the federal policy favoring arbitration of statutory claims by enforcing arbitration agreements covering statutory claims under the Sherman Act (*see Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 640 (1985)); the Securities Act of 1933 (*see Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 483, (1989); the Securities Exchange Act of 1934 (*see Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 238 (1987)); and the civil provisions of the Racketeering Influenced Corrupt Organizations Act (*see McMahon*, 482 U.S. at 242).

9 M.G.L c. 151 §1A was "intended to be 'essentially identical' to Federal law [FLSA]." *Swift v. Autozone Inc.*, 441 Mass. 443, 447 (2004) quoting *Valerieo v. Putnam Assoc. Inc.*, 173 F.3d 35, 40 (1st. Cir. 1999). Therefore, DRC's analysis of the arbitrability of plaintiffs' FLSA claim applies with equal force to the State Claim. DRC's research has not uncovered a case in which the arbitrability of a claim under M.G.L. c. 151A was discussed. The Supreme Judicial Court has, however, held that agreements to arbitrate "should be construed as broadly as [the agreement] was intended." *Barletta v. French*, 34 Mass. App. Ct. 87, 93 (1993) citing *Danvers v. Wexler Const. Co.*, 12 Mass. App. Ct. 160, 163 (1981). This strong state law policy favoring arbitration, combined with the FAA's preemption of any state law affecting the "validity, enforceability and interpretation of the agreement to arbitrate" (*Baxter Health Care Corp. v. Harvard Apparatus, Inc.*, 35 Mass App. Ct. 204, 205 at n.2 (1993)), makes clear that the plaintiffs' State Claim in this matter is arbitrable.

must establish the Congressional intent with sufficient evidence to rebut the overwhelming presumption in favor of arbitration.

The plaintiffs' claims may be arbitrated. Although the First Circuit has not yet squarely addressed the issue of whether FLSA rights may be arbitrated in the context of an individual agreement (as compared to in the context of a collective bargaining agreement), other federal courts have held that Congress did not intend to exclude actions arising under the FLSA from arbitration pursuant to an individual agreement to arbitrate, and therefore, FLSA claims are arbitrable. *See Kuehner v. Dickinson & Co.*, 84 F.3d 316, 319-20 (9th Cir. 1996) (finding no evidence that Congress intended to preclude arbitration of FLSA claims in the text or legislative history of the statute); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 506 (4th Cir. 2002) (holding that FLSA claims are arbitrable); *Floss v. Ryan's Family Steak Houses*, 6 Wage & Hour Cas. 2d (BNA) 17 (6th Cir. 2000) (Noting that FLSA claims could be compelled to arbitration pursuant to an arbitration agreement because broader public policies furthered by such a claim are not hindered when that claim is resolved through arbitration.)

*Barrentine v. Arkansas-Best Freight System, Inc.*, 450 U.S. 728 (1981), decided by the Court pre-*Gilmer,* is not controlling here, in this non-collective bargaining context. In *Barrentine*, the Court held that an employee subject to a collective bargaining agreement could proceed to a judicial forum regarding his FLSA rights even after having arbitrated the same issues in a union supported arbitration. The Court reasoned that the employee's union struck the bargain with the employer, not the employee, and the FLSA was intended to protect individual rights. While never explicitly overruling *Barrentine,* more recent Federal Circuit Appellate cases (including those cited above) have held that statutes containing the identical language found in the FLSA are arbitrable. The distinguishing factor in those cases has been that, like the instant

case, the plaintiff was an individual employee, not subject to a collective bargaining agreement, who had individually entered into the agreement to arbitrate. *Carter v. Countrywide Credit Indus., Inc.* 362 F.3d. 294, 298 (5th Cir. 2004) ("Significantly, *Barrentine* involved arbitration agreements like the ones at issue here. This difference is not insignificant; the Supreme Court explicitly distinguished between these two types of arbitration agreements in *Gilmer*, ultimately concluding that the former may not be subject to arbitration while the latter are"); *Adkins* 303 F.3d at 506 ("*Barrentine* was limited to the case of collective-bargaining arbitration and was thus rooted in substantive concerns that simply do not apply to [individual agreements to arbitrate FLSA claims]"); *Gilmer*, 500 U.S. at 35. In addition, as the Supreme Court also noted in *Gilmer* that *Barrentine* was decided during a period of judicial skepticism concerning the efficacy of arbitral forums. By the time of *Gilmer*, and after Congress amended the Federal Arbitration Act to explicitly recognize the validity of agreements to arbitrate, the "mistrust of the arbitral process" expressed by *Barrentine*-era cases had been "undermined by [the Supreme Court's] recent arbitration decisions." *Id.* at 34 n.5. *Gilmer,* and the trio of Supreme Court cases cited in footnote 8 of this brief, reflect this post-*Barrentine* change in the acceptance of arbitration as a desirable forum to resolve statutory claims. This Court, too, recognized this distinction between individual agreements to arbitrate and collective bargaining agreements in *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith*, 965 F.Supp. 190, 196 (D. Mass. 1997).

Since the parties agreed to resolve the claims asserted in the Complaint through the Program, and because such statutory claims may be compelled to arbitration, the Court, based on the cited authorities, must dismiss this legal action and compel compliance with the Program.

**4. Compliance with the Program Requires that Plaintiffs Assert Their Claims Individually, and not Collectively in a Class Action.**

The Program is absolutely clear:

> The Arbitrator shall have no authority to consider class claims or join different claimants or grant relief other than on an individual basis to the individual employee involved. The right of any party to pursue a class action for any Dispute subject to the Program shall be waived to the fullest extent permitted by law. (LeBlanc Affidavit, Ex. 3, p. 20).

Whether this provision is viewed as a limitation on the authority of the arbitrator,[10] or as a waiver by the employee and DRC to pursue a class action, the provision must be enforced just like any other provision of the Program. *See Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 559 (7th Cir. 2003) ("having found the Arbitration Agreement enforceable, we must give full force to its terms . . . the Arbitration Agreement at issue here explicitly precludes the Livingstons from bringing class claims or pursuing class action arbitration; so we are therefore obliged to enforce the type of arbitration to which these parties agreed, which does not include arbitration on a class action basis"); *Adkins*, 303 F.3d at 503 (Enforcing arbitration provision's prohibition on class actions); *see also Greentree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452-53 (2003) (Recognizing that FLSA claims may be waived in an arbitration agreement, and that such a waiver is enforceable).[11]

The *Adkins* Court wrote:

> As the Third Circuit has held, "simply because judicial remedies are part of a law does not mean Congress meant to preclude parties from bargaining around their availability." Adkins points to no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute. His inability to bring a class action, therefore, cannot by itself defeat the strong congressional preference for an arbitral forum. *Adkins*, 303 F.3d at 503 (internal citations omitted).

---

[10] It is axiomatic that an arbitrator may not exceed the express authority granted to him by the arbitration agreement. *Air Line Pilots Ass'n Int'l v. Aviation Ass'n*, 955 F.2d 90, 93 (1st Cir. 1992).

[11] Since the language of the Program is clear that class actions may not be decided by the arbitrator or pursued by the employee or DRC, the enforceability of this provision is a question of law for the Court and not a question of contract interpretation to be decided by the arbitrator. *Livingston*, 339 F.3d at 559. Contrast this with the discussion in *Greentree Fin. Corp.*, 539 U.S. at 451-53, where the Court was faced with substantial ambiguity in the arbitration agreement.

These holdings are consistent with the ordinary contract principle that an agreement must be enforced in accordance with its terms (*Mfrs' Fin. Co. v. McKey*, 294 U.S. 442 (1935)), and with one of the fundamental tenets of arbitration law: that the purpose of a court in construing an arbitration provision is to give effect to its terms, so that the parties are compelled to arbitrate only those claims which they agreed to arbitrate. *Volt Info. Scis. v. Bd. of Trs.*, 489 U.S. 468, 479 (1989) (noting "...the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms"). Here, the parties agreed that class action claims could not be pursued. This Court must give effect to this agreement in compelling compliance with the Dispute Resolution Program.

**CONCLUSION**

In sum, this case involves statutory claims brought by individuals outside the collective bargaining agreement context, and plaintiffs who voluntarily agreed to adjudicate those claims through the Dispute Resolution Program in lieu of a court of law. The plaintiffs were given clear and ample notice of the Program and of the fact that by remaining in the employ of DRC, they were agreeing to be bound by it. The Program expressly preserves for the plaintiffs all of the substantive rights and remedies available to them under the FLSA and Massachusetts law, in

a court of law. On these facts, the Court must dismiss the Complaint and enter an Order compelling the plaintiffs to adjudicate their claims in accordance with the Program.

DYNAMICS RESEARCH CORPORATION,

By its attorneys,

David S. Rosenthal (BBO # 429260)
Carrie J. Campion (BBO # 656451)
Jeffrey B. Gilbreth (BBO # 661496)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
617-345-1000

Dated August 8, 2005

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by mail/hand on August 8, 2005.