UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| JOSEPH SKIRCHAK and BARRY L. ALDRICH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>DYNAMICS RESEARCH CORPORATION,<br><br>Defendant. | Civil Action No.: 05 11362 MEL |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S
MOTION TO COMPEL ARBITRATION**

Plaintiffs filed this class and collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ et seq., and Mass. Gen. Laws Ch. 151 §§ 1A and 1B, respectively, as a result of the Defendant's willful and intentional violation of the Salary Basis test for Exempt employees. The Defendant, Dynamics Research Corporation, Inc. ("DRC" or "Defendant"), is a publicly held company providing computer-based systems development and support services to federal, state and local government entities. As alleged in the complaint, DRC had a policy allowing for partial-day deductions from exempt employees' wages in violation of the Salary Basis test as described in the FLSA and the Massachusetts Wage Act. Such deductions from Plaintiffs and class members were inconsistent with exempt status, and therefore, Plaintiffs and class members were not exempt from the overtime provisions of the FLSA and the Massachusetts Wage Act during all pay periods in which DRC's partial-day deduction policy was in effect. Plaintiffs now seek restitution for the unpaid balance of overtime compensation,

liquidated damages, attorneys' fees and costs, and any other damages to which they may be entitled under law. Plaintiffs further seek class and collective action status so that other similarly situated past and current employees may opt into the case and recover all compensation and other damages legally owed to them by the Defendant.

In response to Plaintiffs' complaint, Defendant filed a Motion to Compel Compliance With the Dispute Resolution Program, which this Court should deny in full because the Plaintiffs and class members did not receive sufficient notice of Defendant's intent to implement the Dispute Resolution Program ("DRP") and enforcement of the DRP's purported waiver of class action rights would be inconsistent with the DRP's repeated guarantees that it would not limit or change employees' legal rights, substantively unconscionable, and would constitute an invalid waiver of Plaintiffs' and class members' unwaivable rights to pursue their wage claims under the FLSA.

For these reasons, which are described more fully below, the plaintiffs urge this Court to deny the defendant's Motion to Compel in full and to allow the plaintiffs to pursue this class and collective action in this Court.

In the alternative, the plaintiffs request that the Court sever the clause in Defendant's DRP which purports to deny an arbitrator's authority to consider class claims and waive employees' rights to pursue class relief, as this clause is ambiguous, inconsistent with other provisions of the DRP, and unconscionable.

**I.    Statement of Facts**

The Plaintiffs are current or former exempt employees of DRC. There are approximately 500 Massachusetts-based current or former exempt employees and approximately 1,100 current or former exempt employees throughout the rest of the U.S.

*See* Complaint, ¶ 26. Plaintiff Joseph Skirchak worked for DRC as Director of Compensation and Retirement Programs from April 23, 2001, until October 1, 2004. *See* Skirchak Affidavit, ¶ 2, attached hereto as Exhibit 1. Plaintiff Barry Aldrich worked for DRC as Vice President of Contracts from December 10, 2000, until November 12, 2004. *See* Aldrich Affidavit, ¶ 2, attached hereto as Exhibit 2. On December 1, 2003, DRC attempted to implement the DRP, a company-wide program that was to be a binding contract which would dramatically alter every employee's legal rights by having them agree to resolve all disputes arising out of the employment via arbitration and waive the right to a jury trial or any trial in a court of law. *See* LeBlanc Affidavit submitted in conjunction with Defendants' Memorandum, Ex. 3, pp. 16, 18. The DRP was intended to be mandatory, and acceptance of the DRP was to be a condition of continued employment. *Id.* The defendant did not ask for a signature to signify agreement with the DRP, nor was there any mechanism in place to show DRC whether employees even knew about the new program. According to the DRP, all one had to do to accept and be "covered" by the DRP was to show up for work on December 1, 2003. LeBlanc Affidavit, Ex. 3, p. 6.

DRC indicated the pending implementation of the DRP by sending a company-wide e-mail message on November 25, 2003, which contained a link to a DRC website on which the DRP was posted. LeBlanc Affidavit, Ex. 1. In order to actually see the DRP, an employee would have to "click" the link in the message, open the website, and read the information posted there. *Id.* Because the e-mail was sent two days before the Thanksgiving holiday, which fell on November 27 and 28 in 2003, only those employees who were working the day or so before Thanksgiving -- which is often a very busy time,

3

as employees try to wrap up projects before the holiday – who chose to open and read the message, and who chose to follow the link and read the website containing the DRP would have had any notice of the pending implementation of the DRP before their alleged acceptance of it by returning to work on December 1, 2003, the day after the four-day Thanksgiving weekend. The e-mail message also suggested contacting the DRC Human Resource (HR) representative with questions, but the HR representative was apparently out of the office on the day before Thanksgiving. Aldrich Affidavit, ¶ 9. This method of "notice" is clearly inadequate and seems to have been designed to fail to provide most employees with actual notice of the DRP before their return to work on December 1, 2003, at which time they allegedly agreed to the DRP whether they knew about it or not.

Regarding the content of the e-mail, there was no indication in the subject heading that the e-mail was of critical importance or that the DRP would change the employees' legal rights. LeBlanc Affidavit, Ex. 2. There was no mention in the e-mail that acceptance of the DRP was a condition of continued employment, that it was mandatory, that it was intended to be a binding contract, or that simply by returning to work on December 1, employees would accept the DRP and waive their rights to resolve employment disputes in court or pursue class actions. To the contrary, as discussed in further detail below, the e-mail stated that "[t]he program does not limit or change any substantive legal rights." *Id.*

On November 14, 2003, prior to the November 25, 2003, e-mail to all DRC employees, Defendant sent a similar e-mail to its general managers only. *See* Defendant's Memorandum, p. 5. Plaintiff Skirchak was not a general manager and

4

therefore would not have received this e-mail, despite Defendant's suggestion to the contrary. *Id.* This e-mail stated that the DRP would be mandatory and non-discretionary, but these statements were omitted from the November 25, 2003, e-mail, although the rest of the e-mail was virtually identical. *See* LeBlanc Affidavit, Ex. 1, 2. Both messages suggested that questions could be brought to any one of seven HR employees, <u>not</u> including Plaintiff Joe Skirchak, Skirchak Affidavit, ¶7, or to the company's legal counsel, but neither the e-mail nor the DRP suggested that employees consult their own legal counsel prior to relinquishing their rights to sue. *Id.*

Due to the timing of and the manner in which the defendant chose to implement the DRP, the plaintiffs and class members did not have notice prior to December 1, 2003, that as of that date, all disputes between themselves and DRC were to be resolved exclusively in accordance with the DRP. Defendant's e-mail purporting to give notice of the DRP did not accord with its past practices and was clearly not legally sufficient notice to constitute an effective waiver of Plaintiffs' and class members' rights to sue under the FLSA and Massachusetts Wage Law.

DRC did not follow its usual procedure with regard to the implementation of important personnel policy changes: It held no meetings regarding the DRP, conducted no training of managers in order to facilitate a smooth implementation, did not require a signature or acknowledgement of any sort to show that the employees were aware of and understood the ramifications of the new policy, and did not send information to the employees' homes by mail prior to the DRP's implementation. In the past, when DRC implemented new programs of significant importance or that had financial implications, the HR department was required to mail the information to employees' homes. Aldrich

5

Affidavit, ¶¶ 5, 6. When Plaintiff Skirchak implemented new compensation and retirement programs, in addition to placing an article in the company newsletter, "Concerning You," he traveled the country, holding approximately twenty five meetings of three to four hours in duration and sent personalized mailings to employees' homes, and DRC CEO Jim Regan made announcements about these new programs at quarterly staff meetings. Skirchak Affidavit, ¶ 6; Aldrich Affidavit, ¶ 5. Moreover, each year, when the defendant rolls out its annual "Code of Conduct" program, it runs training sessions, and each employee must sign an acknowledgement saying that he or she received and read the distributed materials. Skirchak Affidavit, ¶8.

Plaintiff Skirchak was not aware of the DRP prior to its implementation, and he did not read the mass e-mail because he was busy with the roll-out of a new compensation program. Skirchak Affidavit, ¶ 4. In late 2003, he typically worked between sixty (60) and eighty (80) hours per week. *Id.* He did not participate in the development or implementation of the DRP or learn anything about it prior to December 1, 2003. Skirchak Affidavit, ¶¶ 4, 5.

Plaintiff Aldrich was also not aware that the DRP was to be implemented on December 1, 2003, and that by returning to work on that day he would, according to DRC, agree to its terms. Aldrich Affidavit, ¶ 8. When Plaintiff Aldrich questioned John Wilkinson, the VP of HR, about the implementation process, Wilkinson told him that when HR asked CEO James Regan to implement the DRP in March 2004 following DRC's standard notification and training, Regan ordered that HR "just get it out there now." Aldrich Affidavit, ¶¶ 4, 5, 7, 8, 10.

II.     **Argument and Citation of Authority**

A.      **PLANTIFFS MUST BE ALLOWED TO PURSUE THEIR CLAIMS IN A COURT OF LAW, AS THE DRP IS INVALID**

Under Massachusetts law, a valid contract requires offer, acceptance and consideration. *See Haverhill v. George Brox, Inc.*, 47 Mass. App. Ct. 717 (Mass. App. Ct. 1999). This Court has recognized that "continuing to work with the knowledge that a dispute resolution program has been implemented and is a mandatory condition of continued employment can constitute acceptance ... [but] an employee's knowledge of the offer is obviously a necessity for the inference of acceptance to hold." *Campbell v. Gen. Dynamics Gov't Sys. Corp.*, 321 F.Supp.2d 142, 148 n. 3 (D. Mass. 2004) (*citing Hightower v. GMRI, Inc.*, 272 F.3d 239, 241 (4th Cir. 2001)). In *Campbell*, the District Court held that under Massachusetts contract law, the defendant's arbitration policy could not be enforced because the defendant's attempt to give notice through an e-mail message was insufficient, and so there was "simply no valid Contract." 321 F.Supp.2d at 148-49. This decision was affirmed on appeal to the First Circuit Court of Appeals, which emphasized that the defendant's mass e-mail, which did not require an affirmative response but requested that the recipients review the materials, was not a traditional means for conveying contractually binding terms of employment and did not state directly that the policy contained a mandatory arbitration agreement that would become the employee's exclusive remedy for all claims. *Campbell v. General Dynamics Government Systems Corp.*, 407 F.3d 546, 558 (1st Cir. 2005) ("[R]ather than cluing in the reader by including a simple statement of the kind contained in the policy itself ... we conclude that it failed to put the recipient on inquiry notice").

7

The facts in *Campbell* virtually mirror the facts in the case at bar. As in *Campbell*, DRC did nothing but send an e-mail to make its employees aware of the DRP prior to its implementation. 407 F.3d at 547-48. DRC, like the defendant in *Campbell*, failed to require its employees to signify by return e-mail that they had read the e-mail, or more importantly the attachments, and understood how they would be affected by the new program. 407 F.3d at 548-49. Neither company held any meetings with a sign-in sheet in order to monitor which employees attended.

Unlike DRC, the defendant in *Campbell* took the simple step of monitoring which employees opened the e-mail, but the District Court noted that "receiving an email in a virtual mailbox is not the same as receiving a letter in a real mailbox. Showing that someone opened an email is not the same as showing that they acknowledged it." 321 F.Supp.2d at 149. The District Court concluded that "sending a mass email message, without more, fails to constitute the minimal level of notice required by the First Circuit under *Rosenberg* and other decisions." *Id.* (*citing Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 19 (1st Cir. 1999)). In this case, DRC did even less than the defendant in *Campbell*, as it did not take the step of monitoring which employees opened the mass e-mail, so its attempt to give notice prior to the implementation of the DRP must also fail the First Circuit standard set out in *Rosenberg* and the *Campbell* decisions.

DRC had the ability to control the level of notice, since it drafted the DRP and was aware of the significance of the rights the policy would affect, so DRC should bear the risk of ignorance for those employees who did not choose to read the e-mail and the website to which it provided a link. *See Campbell*, 321 F.Supp.2d at 149; *Rosenberg v.*

*Merrill Lynch,* 170 F.3d. at 19. DRC, had it wanted to do so, could have cheaply and easily announced the DRP in a way that would have ensured that every employee knew about it prior to its implementation, so it is only proper now that DRC bear the risk associated with its minimal effort. *Id.*

**B.    THE DRP IS UNENFORCEABLE BECAUSE IT PURPORTS TO PROHIBIT CLASS AND COLLECTIVE ACTIONS, WHICH WOULD BE CONTRARY TO ITS STATED TERMS AND SUBSTANTIVELY UNCONSCIONABLE**

**1.    The FLSA and Massachusetts Wage Law Provide for Plaintiffs' and Class Members' Rights to Pursue Class Actions**

Both the FLSA and the Massachusetts state wage law's civil enforcement provision expressly provide for collective actions, and for good reason. The statutes encourage private civil actions to be brought on behalf of groups of affected employees, since the Department of Labor and the Attorney General's office are not able, due to limited resources, to prosecute all meritorious wage claims. Because wage claims, such as the one in the case at bar, that challenge an employer's policy typically will affect groups of employees, and not just individuals, the statutes enable aggrieved employees to retain counsel to serve essentially as a private attorney general to prosecute the case for the entire group. Because each employee's individual damages may not be substantial, the statutes recognize that it may be difficult for aggrieved employees to find counsel willing to take their claims on an individual basis. By providing that these cases may be brought on behalf of all similarly situated employees, the statutes encourage private attorneys to take these cases and thereby help ensure enforcement of the state's wage laws.[1]

---

1. Because employees who have not been paid their full wages are a group unlikely to be able to afford hourly rates of private attorneys, these employees, as the drafters of the FLSA and Massachusetts wage law

Significantly, also, the FLSA and Massachusetts Wage Law provide for aggrieved employees to initiate and participate in class or collective actions because, in the wage context in particular, many employees will understandably not have the motivation to assert their rights individually. Their individual damages may not be large enough to make it worth their while to get involved with a lawsuit. They may be unwilling or unable to bear the cost of out-of-pocket expenses that may be charged to them even in contingency-fee arrangements with counsel. If they are still employed by the defendant employer, they may be understandably nervous to individually make a complaint or demand. In addition, employees may have moved away and not be in a position to individually participate in a wage claim that others can pursue on their behalf. Further, employees who worked at a company for only a brief period of time are likewise unlikely to be motivated to redress their rights.[2]

Allowing a company to foreclose class or collective action wage claims through

---

must have recognized, often enter contingency fee agreements with counsel. In evaluating which cases to take on a contingency fee basis, counsel naturally will be more likely to take cases with higher potential damages.

The statutes do, of course, also provide for the payment of attorneys' fees for successful plaintiffs. However, this provision does not ensure that private attorneys will take on meritorious cases for aggrieved individuals, since if an individual's recovery is far exceeded by the amount of attorneys' fees calculated by a lodestar formula, the courts may not award the attorney the full amount of fees.

2. In *Olson et al. v. Energy North, Inc.*, 1999 WL 1332362 (Mass. Super. Ct. Jan. 14, 1999), the judge also considered these economic considerations in deciding to certify a class action under the Massachusetts' consumer protection statute:

> I also find that a class action is the only means presently available to provide "an effective private remedy" to the gasoline customers allegedly shortchanged by the alleged fraudulent scheme. . . . [T]his scheme may have caused the class of customers to overpay millions of dollars for their gasoline over the period of time alleged. Yet, the amount of money lost by even the largest single gasoline customer is unlikely to reach many thousands of dollars, and the average customer's losses are likely to reach, at most, many hundreds of dollars. Without a class action, no customer would have the economic incentive to bring a law suit of the magnitude needed to prove these allegations. Pragmatically, if a class is not certified to bring this claim, the claim will not be brought by any individual or group of individuals.

*Olson*, 1999 WL 1332362, *6.

arbitration would be to allow the company to shield itself altogether from wage claims of this type, which are likely to affect many employees with claims for relatively small amounts of money. Thus, this result would allow a company to knowingly and willfully flout federal and state wage laws and then immunize itself from litigation by prohibiting class or collective action through an arbitration agreement.

2. **Defendant's Mass E-Mail and the DRP Both State That the DRP Will Not Change or Limit Any of Employees' Legal Rights**

Defendant's mass e-mail to its employees concerning the DRP and the DRP itself repeatedly reassure DRC employees that the DRP will not limit or change any of their legal rights, so it would be unjust to construe the DRP as changing or limiting Plaintiffs' and class members' right to initiate or participate in a class or collective action.

Defendant's November 25, 2003, mass e-mail promises that "[DRP] processes provide the same resolution as can be obtained through the court system but with less cost and complications for all parties" and that "[t]he program does not limit or change any substantive legal rights of our employees." LeBlanc Affidavit, Ex. 2. Since class relief can be obtained through the court system, and since DRC's employees have, as explained in the preceding section, statutorily provided rights to pursue class or collective actions, the natural reading of this message is that the DRP will not limit or change these rights to pursue class relief.

Similarly, the DRP itself states that it "provides protection of [employees'] legal rights – such as prohibitions against discrimination and sexual harassment – and protection of all other rights covered by federal or state law." LeBlanc Affidavit, Ex. 3, p. 5. Again, since DRC employees have the right to pursue a class action pursuant to both federal and state law, this passage promises that the DRP will provide protection of

that right. The DRP also states that one of the "Key Advantages of Arbitration" is that "Resolution/Restitution is the same as a court of law could award you," thus implying that class relief, which a court of law could award, is available under the DRP. LeBlanc Affidavit, Ex. 3, p. 11. In the same vein, the first paragraph of the DRP rules provides that the DRP "is not intended either to abridge or enlarge substantive rights available under applicable law." LeBlanc Affidavit, Ex. 3, p. 16. Based on these clear statements in the mass e-mail and the DRP that the DRP does not change or limit any of the employees' rights, the Plaintiffs' and class members' would be justified in concluding that the DRP would not affect any of their rights, including their statutorily provided rights to pursue wage claims on a class basis.

Long after the above-cited, repeated reassurances that the DRP will not limit or change the employees' rights, the DRP states, in a section misleadingly titled, "Authority," that "[t]he Arbitrator shall have no authority to consider class claims" and that "the right of any party to pursue a class action ... shall be waived to the fullest extent permitted by law." LeBlanc Affidavit, Ex. 3, p. 20. This purported waiver of "the right ... to pursue a class action" is blatantly contrary to the DRP's earlier promises not to limit or change the employees' rights, and enforcement of this inconsistent, "buried" clause would be unjust and would violate the principle of contract construction that where the language of a contract is ambiguous, it must be construed "strongly against the party who drew it." *Leblanc v. Friedman*, 438 Mass. 592, 599 n. 6 (2003) (*quoting Bowser v. Chalifour*, 334 Mass. 348, 352 (1956)); *see also Nadherny v. Roseland Property Co., Inc.*, 390 F.3d 44, 49 (1st Cir. 2004).

In this case, construing the DRP strongly against the drafter, DRC, could mean upholding the DRP's repeated, prominent promises not to limit or change the employees' rights and refusing to enforce the inconsistent purported waiver of their rights.[3] Alternatively, the provision that "the Arbitrator shall have no authority to consider class claims," read together with the promise not to limit the employees' rights, could be construed to mean that although employees' rights to pursue class actions are not limited, they cannot be heard by an arbitrator, so they must be pursued in court. However, the ambiguity cannot be construed against the non-drafter employees so that it denies their rights to pursue class actions, as doing so would be highly unjust and would defeat the employees' reasonable expectations that they could rely on the DRP's promises not to limit or change their rights. Therefore, to the extent that this Court finds any part of the DRP enforceable against the Plaintiffs and class members, it should construe the above-described ambiguity concerning the effect on DRC employees' legal rights strongly against DRC, the drafter, and refuse to deny the Plaintiffs' statutorily provided rights to pursue class relief, whether in this Court or before an arbitrator.

3. **The DRP's Purported Waiver of Plaintiffs' and Class Members' Right to Pursue a Class Action Is Unenforceable on Grounds of Unconscionability**

First Circuit precedent holds that pre-dispute employee arbitration agreements are unenforceable on unconscionability grounds where an employee can show "both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so one-sided as to be oppressive." *Rosenberg*, 170 F.3d at 17.

---

3. Defendant wrongly suggests that the ambiguous provisions concerning the DRP's effects on employees' rights constitute a "clear" prohibition of class actions, but Plaintiffs agree with Defendant's acknowledgement that the enforceability of the purported waiver of class action rights is "a question of law for the Court." *See* Defendant's Memorandum, p. 17 n. 11.

In the case at bar, the Plaintiffs and class members had no meaningful choice about whether to accept the DRP, because it was intended to bind the plaintiffs by default if they chose to show up for work on the day of implementation. Moreover, as discussed above, the Plaintiffs had no actual knowledge of the ramifications of the new program, as they had received no actual notice, and therefore they had no meaningful opportunity to decline. Furthermore, as discussed above, the DRP is written in such a confusing and misleading style that the employees would not have been able to understand the nature of the agreement.

In the case of Johnson et al. v. FedEx Ground Package System, Inc., No. 01CV1795 (S.D. Cal. Jan. 15, 2002) (unpublished) (attached hereto as Exhibit 3), the federal court refused to enforce arbitration agreements signed by FedEx drivers by applying state law and determining that the agreements – quite similar to those at issue in this case – were invalid for these same reasons, i.e., because they lacked mutuality, as discussed below, were adhesive, and were unconscionable. Like in Johnson, the arbitration agreement presented by DRC was a "take-it-or-leave-it" policy, in which the plaintiffs had no meaningful choice and no opportunity to negotiate its terms.

Turning to the second prong of the unconscionability standard set forth in *Rosenberg*, the arbitration clause is clearly unconscionable because it is so one-sided as to be oppressive. *See Rosenberg*, 170 F.3d at 17; *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1177 (9th Cir. 2003) ("We find that this bar on class-wide arbitration is patently one-sided, and conclude that it is substantively unconscionable"); *Szetela v. Discover Bank*, 97 Cal.App. 4th 1094, 1101 (Cal. App. Ct. 2002) (holding that a nominally mutual prohibition of class actions is substantively unconscionable because the

defendant would not have occasion to instigate a class action against plaintiffs, and therefore "[t]he manifest one-sidedness of the no class action provision … is blindingly obvious"); *Luna v. Household Finance Corp. III*, 236 F.Supp. 2d 1166, 1177 (W.D. Wash. 2002) (linking "one-sidedness or overly harsh" contract terms with substantive unconscionability).

The United States Supreme Court, recognizing the importance of relief by way of a class action, has stated that "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device." *Deposit Guaranty Nat'l Bank v. Roper,* 445 U.S. 326, 339 (1980); *see also Keating v. Superior Court*, 31 Cal.3d 584, 610 (Cal. 1982), *rev'd on other grounds sub nom. Southland Corp. v. Keating*, 465 U.S. 1 (1984) (holding that "[I]f … an arbitration clause may be used to insulate the drafter of an adhesive contract from any form of class proceeding, effectively foreclosing many individual claims, it may well be oppressive and may defeat the expectations of the nondrafting party"); *Leonard v. Terminix Intern. Co., L.P.*, 854 So.2d 529, 536 (Ala. 2002) ("Several courts confronting this issue have been favorably disposed to the view that an arbitration clause that defeats the prospect of class-action treatment in a setting where the practical effect affords the defendant immunity is unconscionable"). In the *Ingle* decision, the Ninth Circuit cited the *Keating* case for the proposition that "an arbitration agreement that automatically eliminates the right to a class-wide proceeding would have the 'substantial' effect of contravening the principles behind class action policies and 'chilling the effective protection of interests common to a group.'" 328 F.3d at 1176, n. 13.

DRC was first made aware that its partial-day deduction policy violated the FLSA well in advance of the implementation of the DRP, but the CEO continually refused to change the policy. Complaint, ¶ 21. All the while that DRC continued to violate the FLSA, the company faced exposure to a potential class action lawsuit brought by affected employees. DRC was well aware of this exposure and was counseled countless times to change the policy. Complaint, ¶ 22. However, DRC instead attempted to address the issue by implementing the DRP, which it hoped would permit it to continue its wrongful policy without the looming threat of a class action lawsuit. DRC has been and continues to be unjustly enriched by its partial-day deduction policy. It is unlikely that many of the approximately 1,100 exempt employees entitled to damages will be able to or inclined to incur the expense of individually pursuing their claims – whether in this Court or before an arbitrator – as their individual damages would not be substantial enough to warrant it. The clause in question is, therefore, patently unconscionable.

C.  **AN EMPLOYER CANNOT, AS A CONDITION OF EMPLOYMENT, REQUIRE ITS EMPLOYEES TO SUBMIT THEIR FLSA CLAIMS TO BINDING ARBITRATION**

The DRP's purported prohibition of class actions cannot be enforced with respect to Plaintiffs' and class members' non-waivable rights to participate in FLSA class actions.[4] In *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) the Supreme Court held that an employee could not be compelled to comply with an agreement to arbitrate if he or she could demonstrate that Congress intended to preclude a waiver of a judicial forum. *Id.* This intent, the Court explained, would be found in the text of the

---

4. Defendant acknowledges this as a possibility, and though it opines that Plaintiffs face an "uphill battle" to establish the non-waivability of FLSA class action rights, it concedes that "the First Circuit has not yet squarely addressed the issue of whether FLSA rights may be arbitrated." *See* Defendant's Memorandum, p. 14-15. Since this issue is still undecided in this Circuit, Defendant's citations to other courts' holdings concerning the issue are not dispositive.

statute, its legislative history, or in an "inherent conflict" between arbitration and the statutory purposes. *Id.*; *see also, Rosenberg*, 170 F.3d at 11; *Seus v. Nuveen & Co. Inc.*, 146 F.3d 175, 178 (3d Cir. 1998).

1. **Congress' Limitation on Employee Waivers of Section 16(b) Rights in the Context of Post-Dispute Settlements Evinces a Congressional Intent to Preclude Such Waivers in the More Suspect Context of Pre-Dispute Agreements**

In the 1949 amendments to section 16, Congress set forth the limited circumstances in which employees can release or waive their rights to file suit for back wages and liquidated damages pursuant to a settlement agreement. The provision, section 16(c), authorizes the Secretary to supervise the distribution of the back wages owed upon the agreement of the employer to make full restitution. It further provides that the employee's agreement to accept the payment under federal supervision "shall upon payment in full constitute a waiver by such employee of any right he may have under subsection (b)" to judicial remedies. 29 U.S.C. 216 (c).

The section 16(b) rights which Congress has deemed unwaivable without the Secretary's supervision include not only the right to back wages and liquidated damages, but also the right to pursue these remedies in court. The Supreme Court's decision in *Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728 (1981) strongly supports this view. There the Court held that the unfavorable resolution of employees' wage claims under a collectively bargained arbitration clause did not bar a subsequent lawsuit under the FLSA based on the same facts. Observing that in section 16(b), the FLSA "grants individual employees broad access to the courts," the Court emphasized that "[n]o exhaustion requirement or other procedural barriers are set up [under the FLSA], and no other forum for enforcement of statutory rights is referred to or created by the statute."

17

450 U.S. at 740 (footnote omitted).  Furthermore, the Court notes that its prior decisions, *inter alia, Brooklyn Savings Bank* and *Shulte*, stressed the "nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act . . . [and] held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine*, 450 U.S. at 740 (citations and footnote omitted). Implicit in this reliance on the nonwaiver rule in reaching its decision is the Court's view that the rule precludes the waiver of the employee's right to sue in a judicial forum.

Congress' unusual limitations on post-dispute waivers under the FLSA reveal a congressional intent to preclude the waiver of FLSA rights in pre-dispute agreements to arbitrate entered into as a condition of employment.  The same policy concern and statutory goal which underlie the limitations on post-dispute waivers compel this conclusion.  It is beyond dispute that pre-dispute waivers are subject to far greater scrutiny then post-dispute waivers, and in fact, generally, are prohibited. *See e.g.*, 29 U.S.C. 626(f)(1)(c) (under OWBPA, post-dispute settlements may not waive future claims); *Babbitt v. Norfolk & Western Railway Co.*, 104 F.3d 89, 93 (6th Cir. 1997) (release cannot extinguish future claims).  Requiring employees to prospectively waive their statutory rights to sue under section 16(b) in order to obtain and maintain their employment is completely inconsistent with the statutory purpose of protecting that class of employees that possesses the least bargaining power in the workforce: "the unprotected, unorganized and lowest paid of the nation's working population." *Brooklyn Savings Bank*, 324 U.S. at 707 n. 18.  Pre-dispute waivers are more harmful to this

statutory goal than are those executed after a dispute arises, because they "tend [ ] to encourage violation of laws ...." *Id.* at 710.

Congress designed section 16(b) to provide employees the means to fully vindicate their rights to the statutory wages, while also serving the public interest by alleviating, at least somewhat, the government's enforcement burden. Clearly, Congress intended that the most vulnerable workers in our nation should be guaranteed a minimum wage and premium pay for overtime hours and the right to enforce these and related guarantees in court before judges and juries, who are guided by expressions of congressional intent, Department of Labor regulations and interpretations, and judicial precedent. These rights should not be subject to any restriction as a condition of employment.

### III. Conclusion

For the reasons stated above, the Court should deny in full the Defendant's Motion to Dismiss Complaint and Compel Plaintiffs' Compliance With the Dispute Resolution Policy. Alternatively, the Court should hold that the DRP's purported waiver of class action rights is unenforceable and permit Plaintiffs' claims to proceed on a class basis, whether in Court or before an arbitrator.

Respectfully submitted,
JOSEPH SKIRCHAK and BARRY L.
ALDRICH, on behalf of themselves and all
others similarly situated,
By their attorneys,

_____
Elayne N. Alanis, BBO#660365
Law Firm of Elayne N. Alanis
10 Tremont Street, Third Floor
Boston, MA 02108
(617) 263-1203

Shannon Liss-Riordan, BBO#640716
Stephen Young, BBO#662914
Pyle, Rome, Lichten, Ehrenberg &
Liss-Riordan, P.C.
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 367-7200

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2005, I caused a copy of this document to be served by facsimile and first class mail on David S. Rosenthal, Carrie J. Campion, and Jeffrey B. Gilbreth, Nixon Peabody LLP, 100 Summer Street, Boston, MA 02110.

_____
Elayne N. Alanis, Esq.