UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                )
JOSEPH SKIRCHAK and BARRY L.    )
ALDRICH,                        )
     Plaintiffs,                )
                                )
          v.                    )     05-CV-11362-MEL
                                )
DYNAMICS RESEARCH CORPORATION,  )
INC.,                           )
     Defendant.                 )
                                )
```

MEMORANDUM AND ORDER

LASKER, D. J.

Plaintiffs Joseph Skirchak and Barry L. Aldrich sue Dynamics Research Corporation, Inc. ("DRC") pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, and M.G.L. c. 151. The Complaint alleges that DRC willfully failed to pay the named plaintiffs, and all other similarly situated employees categorized as "exempt", time-and-a-half their regular pay rate for time worked in excess of forty hours per week.

DRC moves to dismiss the Complaint and to compel compliance with its Dispute Resolution Program ("DRP" or "the Program"). The central question for decision is whether an arbitration agreement that bars class actions is unconscionable in the context of this FLSA claim.

I. Relevant Facts

The Dispute Resolution Program at issue came into

1

effect on December 1, 2003.  The Program applies to all DRC employees, including managers and executive officers, and requires them to submit any work-related dispute[1] to binding arbitration, rather than seeking redress in a court of law.  The Program is intended to create an exclusive procedural mechanism for the final resolution of legal disputes between DRC employees and the company.

DRC first informed all employees of the pending implementation of the Program through a company-wide email message on November 25, 2003.  The subject line of the email read "Employee Dispute Resolution Program".  The text of the email indicated that: "On December 1, 2003, a new Policy entitled the 'Dispute Resolution Program' will take effect."  The email then described the new policy as something that "expands upon" and "enhances" DRC's then-existing Problem Resolution Policy by including the "additional and more formal processes" of mediation and arbitration.  The email further stated that once effective, the Program would apply to all workplace disputes.  Finally, the email informed employees that: "The program does not limit or change any substantive legal rights of our employees, but it does require that you seek resolution of such rights and complaints by

---

[1] Disputes that an employee desires to bring before the Equal Employment Opportunity Commission, the Massachusetts Commission Against Discrimination, or the Board of Industrial Accidents are excluded from the scope of the Program.

following the procedures of the program."

In addition to the text, the email contained a link to a DRC website on which the Dispute Resolution Program was posted. In order to view the actual provisions of the DRP, an employee would need to click the link in the email message to open the website, and then read the available information.  The DRP itself is a 33 page document containing three appendices.  Rule 12 of Appendix A, entitled "Dynamics Research Corporation's Dispute Resolution Program Rules", is the focus of the Court's inquiry. Entitled "Authority", that rule provides: "The Arbitrator shall have no authority to consider class claims or join different claimants or grant relief other than on an individual basis to the individual employee involved.  The right of any party to pursue a class action for any Dispute subject to the Program shall be waived to the fullest extent permitted by law."

Prior to the company-wide email of November 25, 2003, DRC sent a similar email, with the subject "Dispute Resolution Program", to its general managers on November 14, 2003.  In contrast to the email of November 25, however, the email sent to the general managers stated that the Program would be "mandatory" and "non-discretionary".

Finally, subsequent to the DRP's implementation on December 1, 2003, DRC reminded its employees of the Program's existence and terms through its monthly internal newsletter.  The

front page articles in the January and February 2004 editions, as well as an article in the November 2004 edition, were dedicated to the DRP.  The January 2004 article essentially repeated the substance of the November 25, 2003 email.  It further stated that the Program took effect on December 1, 2003, applied to "all workplace disputes", and "required that you seek resolution of such rights and complaints by following the procedures of the program."  The February 2004 article discussed the mandatory nature of the Program by informing employees that "a suit brought in court that should have been addressed under the [Program] will be subject to a motion to remove the dispute from the court and have it placed under the [Program] for resolution."

## II. The Federal Arbitration Act

The Federal Arbitration Act ("FAA") provides that pre-dispute arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The FAA applies to arbitration agreements, like the one at issue in this case, that cover employment-related claims.  See Circuit City Stores v. Abrams, 532 U.S. 105, 121 (2001).  The Supreme Court has stated that the purpose of the FAA is "to reverse the longstanding judicial hostility to arbitration agreements... and to place [them] upon the same footing as other contracts." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991).

Accordingly, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements." Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996).  However, due to the strong presumption in favor of arbitration, a party seeking to invalidate an arbitration agreement bears the burden of proof.  Gilmer, 500 U.S. at 26.

### III. The Fair Labor Standards Act

Congress' principal purpose in enacting the FLSA was to protect workers from substandard wages, oppressive working hours, and labor conditions that are detrimental to maintenance of minimal standards of living necessary for the health, efficiency, and well-being of workers.  29 U.S.C. § 202(a).  Nothing in the text, legislative history, or purpose of the FLSA indicates that Congress intended to confer a non-waivable right to class actions under the statute.  See Kuehner v. Dickinson & Co., 84 F.3d 316, 319-20 (9th Cir. 1996).  Nevertheless, Congress did contemplate and provide for collective actions under the FLSA.  29 U.S.C. § 216.  In so doing, Congress implicitly recognized that because each employee's damages may be insubstantial, employees may lack the financial incentive or resources to bring suit individually, and that absent a mechanism for class actions there would be a substantial risk that FLSA violations would not be redressed.  See, e.g., Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326,

339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."); see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985); Eisen v. Carlisle & Jacquelin, 417 U.S. 157, 161 (1974). By encouraging private civil actions on behalf of groups of affected employees, class actions under the FLSA therefore serve the public interest. Allowing private attorneys to prosecute such actions in the aggregate effectively ensures enforcement of the wage laws by motivating employers to comply or face potentially large-scale litigation, and by providing counsel with an incentive to pursue such claims. See Amchem Products, Inc. v. Windsor, 521 U.S. 591, 617 (1997).

## IV. Unconscionability

The plaintiffs argue that the provision of the Dispute Resolution Program which bars class actions cannot be enforced because it is unconscionable, and that this provision should accordingly be severed from the agreement.

In evaluating the validity of an arbitration agreement, courts apply ordinary state law principals governing contract formation. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Accordingly, this Court looks to Massachusetts law, under which unconscionability "must be determined on a case-

by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party and not to allocation of risk because of 'superior bargaining power'." Waters v. Min. Ltd., 412 Mass. 64, 68 (1992); Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 292-93 (1980). The Supreme Judicial Court has recognized two types of unconscionability: (1) procedural unconscionability, meaning the circumstances surrounding the adoption of the arbitration agreement, and (2) substantive unconscionability, meaning the fairness of the arbitration provision itself. Waters, 412 Mass. at 67-68; Zapatha, 381 Mass. at 293-95. As the First Circuit has summarized, to establish unconscionability a plaintiff must demonstrate "both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive." Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, 170 F.3d 1, 17 (1st Cir. 1999) (quoting Seas v. John Nuveen & Co., Inc., 146 F.3d 175, 184 (3d Cir. 1998)).

*A. Procedural Unconscionability*

The context in which DRC adopted the Dispute Resolution Program compels the conclusion that the class action provision is procedurally unconscionable. There is evidence that DRC management was aware that it was in violation of the wage laws and rushed to implement the Program in an attempt to protect

itself from potential liabilities. (Skirchak Aff., ¶ 6; Aldrich Aff., ¶ 8.) In so doing, DRC failed to follow its usual procedure for implementing personnel changes, which often included holding meetings with employees, conducting manager training about the new policy, requiring employees to acknowledge their awareness and understanding of a new policy, or sending information to employees' homes.

  Moreover, DRC's use of email as the primary means to inform employees about the implementation of such a drastic change in policies governing the disposition of employee grievances created significant notice problems such that the plaintiffs can not be held to have knowingly agreed to waive their right to pursue class actions. In this case, neither the subject line nor the content of the November 14 and 25, 2003 emails indicated that the Program was of critical importance and would alter employees' rights. The emails did not state that acceptance of the Program was a condition of continued employment or that by returning to work on December 1, 2003, an employee thereby accepted the terms of the DRP and waived his rights to pursue class actions. DRC did not track whether employees had opened the email about the DRP and followed the link to the Program's website to view its contents, nor did DRC request a signature or even an email reply to verify consent to be bound by the Program. Finally, the articles about the Program in DRC's

internal newsletter did not appear until after the Program's implementation, and cannot be deemed to create an agreement encompassing the terms of the DRP.

In sum, plaintiffs Skirchak and Aldrich were not aware of the DRP's implementation on December 1, 2003, and therefore had no meaningful choice as to whether to accept the waiver of class actions. (Skirchak Aff., ¶4; Aldrich Aff., ¶8.) Although "continuing to work with the knowledge that a dispute resolution program has been implemented and is a mandatory condition of employment can constitute acceptance...an employee's knowledge of the offer is obviously a necessity for the inference of an acceptance to hold." Campbell v. General Dynamics Government Systems Corp., 321 F.Supp.2d 142, 148 n.3 (D. Mass. 2004), aff'd Campbell v. General Dynamics Government Systems Corp., 407 F.3d 546, 558 (1st Cir. 2005). In the instant case, the plaintiffs had no meaningful choice about whether to accept the Program's terms because it bound them by default, and without their knowledge, when they arrived for work on the day of its implementation. Moreover, because the plaintiffs had no actual knowledge of the ramifications of the DRP, they had no meaningful opportunity to decline to be bound by it. Finally, the text of the DRP is written in a sufficiently confusing and technical style that a reasonable or average employee would not have been able to understand the significance of its terms. For these

reasons, I find that the class action provision of the Program is procedurally unconscionable.

### B. *Substantive Unconscionability*

Turning to the question of substantive unconscionability, I conclude that the class action provision of the DRP is so one-sided as to be oppressive. See Rosenberg, 170 F.3d at 17; Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1177 (9th Cir. 2003) ("We find that this bar on class-wide arbitration is patently one-sided, and conclude that it is substantively unconscionable."). An arbitration agreement that eliminates the right to a class-wide proceeding may have "the 'substantial' effect of contravening the principle behind class action policies and 'chilling the effective protection of interests common to a group'." Id. at 1176, n.13. Requiring employees prospectively to waive their statutory rights to sue in order to obtain or maintain their employment is utterly inconsistent with the FLSA's purpose of protecting the class of employees that possesses the least bargaining power in the workforce: "the unprotected, unorganized and lowest paid of the nation's working population." Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 707 n.18 (1945). In this case, the imposition of a waiver of class actions may effectively prevent DRC employees from seeking redress of FLSA violations. The class action provision thereby circumscribes the legal options of these

employees, who may be unable to incur the expense of individually pursuing their claims.  In this respect, the class action waiver is not only unfair to DRC employees, but also removes any incentive for DRC to avoid the type of conduct that might lead to class action litigation in the first instance.  The class action clause is therefore substantively unconscionable.

### V. Conclusion

For the reasons outlined above, I conclude that the Dispute Resolution Program's purported waiver of class action rights is unconscionable and unenforceable.  Accordingly, the plaintiff's claims may proceed on a class basis before an arbitrator.

It is so ordered.


Dated:    April 6, 2006
          Boston, Massachusetts        /s/ Morris E. Lasker
                                              U.S.D.J.