## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH SKIRCHAK AND BARRY ALDRICH, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| v. | ) ) | |
| DYNAMICS RESEARCH CORPORATION, A Massachusetts corporation, | ) ) ) | Civil Action No.: 05-11362 MEL |
| **Defendant.** | ) ) | |

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION OF THIS COURT'S ORDER HOLDING THAT THE CLASS ACTION WAIVER SET FORTH IN THE DISPUTE RESOLUTION PROGRAM IS UNCONSCIONABLE AND, FOR THAT REASON, IS NOT ENFORCEABLE

Defendant Dynamics Research Corporation ("DRC" or the "Company") respectfully requests that the Court reconsider its Order, entered on April 10, 2006 (the "Order"), granting in part and denying in part, DRC's Motion to Dismiss Complaint and Compel Plaintiff's Compliance with the Dispute Resolution Program (the "Motion"). Specifically, DRC requests that the Court reconsider the portion of the Order striking down the class action waiver provision set forth in the Dispute Resolution Program ("DRP") on the grounds that the provision is unconscionable.

As grounds for this Motion for Reconsideration, DRC respectfully submits that:

°     The Court's decision with respect to unconscionability reflects that it relied on facts that were not established in the record, but were very much disputed and contradicted within the record. Given this disputed record, the Court should not have accepted plaintiffs'

version of the facts and rejected DRC's. At the very least, an evidentiary hearing should be held to resolve these issues of disputed fact.

     °     The Court's decision with respect to substantive unconscionability is not supported by existing precedent. Indeed, virtually <u>every</u> federal court that has ruled on the validity of class action waivers in Fair Labor Standards Act ("FLSA") cases has upheld such provisions and found them <u>not</u> unconscionable.

     °     Moreover, the Court applied the incorrect legal standard in analyzing the issue of substantive unconscionability.

For these reasons, the Court should reconsider its decision, and, having done so, should order that the arbitration go forward in accordance with the terms of the DRP, including the class action waiver contained in the DRP. If the Court is going to rely on disputed fact issues in reaching a decision, DRC requests that the Court hold an evidentiary hearing on these disputed issues of fact in connection with this reconsideration.

<div align="center">

**POINT I**
**THE CLASS ACTION WAIVER IS**
<u>**NOT PROCEDURALLY UNCONSCIONABLE.**</u>

</div>

    **1.**    **The Court's conclusion regarding procedural unconscionability is based on facts which are not supported or are contradicted by the factual record before the Court.**

The Court wrote, on page 7 of its Memorandum and Order, that "the context in which DRC adopted the Dispute Resolution Program compels the conclusion that the class action provision is procedurally unconscionable." It is apparent from the Court's decision that the "context" to which the Court referred is identified in the following sentence on page 7 of the Memorandum and Order:

> There is evidence that DRC management was aware that it was in
> violation of the wage laws and rushed to implement the Program in an

attempt to protect itself from potential liabilities.  (Skirchak Aff., ¶ 6; Aldrich Aff., ¶ 8).

There is, in fact, no such "evidence" in the record before the Court.  Neither the Skirchak affidavits nor the Aldrich affidavits provide that "evidence."  Neither Mr. Skirchak nor Mr. Aldrich state in their affidavits when, in relation to the implementation of the DRP, the alleged discussions of FLSA violations took place.  Neither Mr. Skirchak nor Mr. Aldrich state that the DRP was implemented in response to such alleged discussions.  In fact, it was not.  The DRP was implemented for reasons completely unrelated to the alleged discussions of the FLSA, as Richard Covel, the General Counsel of DRC, makes clear in the affidavit he has submitted in support of this Motion for Reconsideration.  (Covel Affidavit, ¶¶ 4, 5).[1]

Also, with regard to "context," the Court is incorrect in concluding that the DRP was implemented in a manner which violated DRC's usual procedures for implementing such policies.  (LeBlanc Affidavit, ¶ 3).  In the LeBlanc Affidavit (paragraph 3), Mr. LeBlanc stated that DRC provided notice of the DRP's implementation to its employees "using the same procedures (email and internal newsletters) it has used in the past to communicate with employees about new employment policies or changes in the terms and conditions of employment."  (*Id.* emphasis supplied).  Skirchak agrees with Mr. LeBlanc's assessment in his affidavit in which he listed "email notifications," and "articles in *Concerning You*" as typical methods used by DRC to disseminate changes in employees' terms and conditions of employment.  (Skirchak Affidavit, ¶ 6).  Mr. LeBlanc also stated that he, as an employee of DRC, received notice of the DRP's implementation through these means.  (*Id.*)

---

[1]     DRC did not previously submit Mr. Covel's affidavit on these issues because there was no reason to do so.  The statements made by the Court regarding "context" were not supported in the record by evidence submitted by the Plaintiffs.  Mr. Covel's affidavit is being submitted now to make clear that as a matter of fact, the Court's conclusions regarding "context" are not accurate.

- 4 -

Further, DRC submitted to the Court its written policy for communicating employment matters to its workforce, which is entitled "Guidance for Writing and Implementing Policies." (Campion Affidavit, Exhibit 2). The policy makes clear that DRC followed its written policies in providing notice of the implementation of the DRP to its employees. According to the policy, notice is to be provided by "announcing via email that the new or revised policy is available on DRC's Intranet" (Campion Affidavit, Exhibit 2, paragraph E(h)(4)). That is precisely what DRC did with respect to the DRP.

In fact, DRC went further than the requirements of its written policy. It published detailed information about the DRP, and an email address to which employees could send questions about the DRP, in three (3) editions of its *Concerning You* newsletter, which it distributed to all of its employees. (LeBlanc Affidavit, ¶¶ 7-10). A description of the DRP was prominently featured in these newsletters soon after its implementation. And, in the case of Mr. Skirchak and Mr. Aldrich, DRC sent them (and other managers) an email on November 14, 2003, attached to which was the DRP, an explanation of the DRP, and a written memorandum further explaining the DRP. (LeBlanc Affidavit, ¶ 4, Exhibit 1). They each received a second email on this subject on the same day. (Covel Affidavit, ¶ 8, Exhibit A). Those emails will be discussed further below.

The Court's conclusion regarding the inefficacy of the email communications appears rooted in a fundamental misunderstanding of the central role of email as <u>the</u> preferred means of communication in most workplaces, and in this workplace in particular. Email is <u>the</u> way in which most large and even smaller companies communicate with their employees. DRC's written communications policy reflects the use of email and DRC's intranet as the primary tools for providing information to its employees. (Campion Affidavit, Exhibit 2, paragraphs D(3)(f),

(g), (h); E(h)(4) and E(i); and the Process Flow Chart, all of which refer to electronic email, email and the intranet as <u>the</u> means for communicating policies). Information communicated to employees by these means includes "employment policies and changes in the terms and conditions of employment." (LeBlanc Affidavit, ¶ 3). In today's workplace, including DRC, employees know to look to the email and intranet systems as the primary locations to learn about Company information and policies, including "changes in the terms and conditions of employment." *See Campbell v. General Dynamics Government Sys. Corp.*, 407 F.3d 546, 555 (1st Cir. 2005) ("in our view, an e-mail, properly couched, can be an appropriate medium for forming an arbitration agreement").

The Court's statement regarding DRC's "failure to follow its usual procedure for implementing personnel changes," is thus contradicted by substantial evidence in the record. While it is true that Mr. Skirchak's Affidavit (¶ 6)[2] provides two examples of his using additional methods of communication, Mr. Covel's affidavit explains that those additional methods of communication, in those instances, were unusual, and not DRC's "usual procedure" for notifying employees of changes to the terms and conditions of their employment. (*See* Covel Affidavit, ¶¶ 7, 9). It simply does not follow that DRC's use of the methods of communication specified in its written policy for such communications, is a "failure to follow its usual procedure for implementing personnel changes."

At the very least, the factual record is disputed on this point, and it is respectfully submitted that the Court erred in simply adopting a version of the facts, which does not appear or is disputed in the record, and using those contested facts to support the Court's decision. It is

---

[2]    Mr. Skirchak and Mr. Aldrich have both submitted two affidavits in this matter. For purposes of this memorandum, all cites to Skirchak Affidavit and Aldrich Affidavit refer to their affidavits submitted in support of Plaintiffs' Response to Defendant's Motion to Compel Arbitration.

- 6 -

well-established that the plaintiffs bore the burden of proof on this notice issue, as the party

seeking to avoid arbitration. *See Greentree Fin. Corp.-Alabama and Green Tree Fin. Corp. v.*

*Randolf*, 531 U.S. 79, 91 (2000) ("the party resisting arbitration bears the burden of proving that

the claims at issue are unsuitable for arbitration"); *Gilmer v. Interstate/Johnson Land Corp.*, 500

U.S. 20, 26 (1991). They did not sustain that burden on this record.[3]

### 2.    Plaintiffs had inquiry and actual notice of the implementation of the DRP and its terms.

While it is clear that the Plaintiffs in this case had actual notice of the implementation and

terms of the DRP, such actual notice is not even required in order to bind them to comply with its

terms. Under existing First Circuit precedent, all that is required is "a minimal level of inquiry

notice to fairly put them [the plaintiffs] on notice that a dispute resolution program has been

enacted." *Campbell*, 403 F.2d at 548. The emails to these human resources professionals from

their boss well before December 1, 2003, and the additional notice provided thereafter, all in

accordance with Company policy, more than suffice for such inquiry notice.

The Court's error on the notice issue is compounded by the fact that all of the evidence

before the Court – consisting of the affidavits of Mr. Skirchak, Mr. Aldrich and Mr. LeBlanc –

prove that the employees at issue in this case (Mr. Skirchak and Mr. Aldrich) did receive <u>actual</u>

<u>notice</u> of the DRP's implementation and understood that they were bound by it. (Leblanc

Affidavit, ¶ 3; Skirchak Affidavit, ¶¶ 4(e), (f), (g); Aldrich Affidavit, ¶¶ 4, 7). Mr. Skirchak also

admits that he attempted to use the DRP to bring a grievance. (Skirchak Affidavit, ¶ 5). Mr.

---

[3]    In a related circumstance, under 9 U.S.C. § 4, where the "making of the arbitration agreement" is in issue, the district court is required to hold a hearing to decide disputed facts. *Mowbray v. Moseley*, 795 F.2d 1111, 1113 n.7 (1st Cir. 1986). "The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4.

Aldrich used the DRP as a manager when one of his employees had an employment-related dispute with DRC. (Campion Affidavit, Exhibit 1). Mr. Aldrich sent an email to the employee stating that all employees were bound by the DRP. (*Id.*) ("we have agreed to follow this policy and process…) (emphasis supplied). Employees who received actual notice of the implementation of the DRP through the means of communication DRC used in accordance with its written policy, asked questions (and received answers to their questions) about the DRP. (LeBlanc Affidavit, ¶ 5). Thus, the empirical, and only evidence, before the Court with respect to the effectiveness of the notice provided by DRC to Mr. Skirchak, Mr. Aldrich, and the other DRC employees is that the notice effectively provided actual notice of the implementation and terms of the DRP.[4]

The only plaintiffs before the Court are Mr. Skirchak and Mr. Aldrich. The evidence before the Court is that both of them received actual notice on November 14 and 25, 2003, of the imminent implementation of the DRP and its terms. Mr. Skirchak does not deny receiving the November 14th and 25th emails before December 1st, and the evidence verifies that he did receive them. (Campion Affidavit, Exhibit 3, which is an email from John Wilkinson, Mr. Skirchak's boss, explaining the DRP—Mr. Skirchak was one of the addressees on this November 14th email). They each received a second email from Mr. Covel on November 14th, flagged as an

---

[4]    The actual notice of the DRP given to Mr. Skirchak, Mr. Aldrich and other employees far exceeds the "the relatively light burden [of] producing evidence demonstrating that the employee[s] had actual notice of the agreement." *See Campbell*, 407 F.3d at 555. In *Campbell*, the employer failed to satisfy this burden because the employer did not have a history of using email to communicate new policies (unlike DRC's stated policy of using email for such communications), and was not explicit in conveying the binding nature of the program (unlike DRC's clear statements of the binding nature of the DRP). *See id.* at 555-58. Also, in that case, the employee contended that he had never seen the policy until the employer sought to use it to compel its use. *See id.* at 555. Here, it is undisputed that Skirchak and Aldrich did see and read the DRP many months before DRC attempted to use it.

email of "high importance,"[5] advising them to send their comments on the DRP to their boss,

John Wilkinson.  (Covel Affidavit, ¶ 8, Exhibit A).  Despite these facts, Mr. Skirchak claims that

he was too busy to read it, and that he chose to take a day off from work on November 25th.

How can Mr. Skirchak's failure to read his work-related email, from his boss, on a subject

related to his duties as a human resources professional, or his decision to take a day off, possibly

excuse his compliance with a company rule or policy?  Is any company employee permitted to

exempt himself from following his employer's rules, regulations and policies because he does

not do his duty and read what his boss disseminates?  The answers to these questions are

obviously no, yet the Court finds inadequate notice to Mr. Skirchak because he just did not do

his job.  *See Rosenberg v. Merrill Lynch, Pierce, Fenner, & Smith*, 170 F.3d 1, 21, FN 17 (1st

Cir. 1999) ("If [the employer] had provided the rules to Rosenberg but she did not read them,

that would not save her").

Mr. Aldrich, by contrast, apparently understood that he was supposed to read emails from

his boss.  He admits reading and commenting on the DRP before its implementation.  (Aldrich

Affidavit, ¶ 7).  In fact, Mr. Aldrich sent his revisions to Mr. Covel on November 19th.  (Covel

Affidavit, ¶ 8, Exhibit B).[6]

The November 14th email sent to Mr. Aldrich, Mr. Skirchak, and other managers reads, in

pertinent part, as follows:

> Please read the letter and plan document attached thoroughly and
> thoughtfully.  Your involvement in the launch of this new policy/practice
> is vital to its success.

---

[5]    Thus, the suggestion in the Court's decision that nothing in the DRC communications to Aldrich and Skirchak
informed them of the emails' "importance," is inaccurate.

[6]    This email exchange between Aldrich and Mr. Covel shows once again that intra-company email was the
preferred method of communication within DRC, and that included the Plaintiffs.

(Campion Affidavit, Exhibit 3).[7]  A document attached to the email also provided Mr. Aldrich, Mr. Skirchak, and all the other recipients, with explicit notice that the DRP was mandatory, and applied to them and all other employees:

> This program is non-discretionary and applicable to all workplace disputes between DRC, applicants for employment at DRC, and DRC's employees, including DRC's officers and managers.

The November 14th email also attached a document that gave Mr. Skirchak and Mr. Aldrich notice that the DRP's "effective date is December 1, 2003, and . . . the program will be distributed to our employees on or before that date."  It is simply ludicrous for Mr. Aldrich to claim, as he does in his affidavit, that he did not understand the importance of the email, that he thought he was just supposed to correct typos, or that he was somehow surprised by the implementation of the DRP on December 1, 2003.  Thus, it is respectfully submitted that the Court's conclusion that "the plaintiffs had no actual knowledge of the ramifications of the DRP" before December 1st is contradicted by the factual record.

The Court's conclusion regarding procedural unconscionability is based, in part, on the statement that "the text of the DRP is written in a sufficiently confusing and technical style that a reasonable or average employee would not have been able to understand the significance of its terms."  There is no evidence to support that conclusion in this case.  The class action waiver now at issue is very clear and simple, consisting of a total of 27 words:

> **The right of any party to pursue a class action for any Dispute subject to the Program shall be waived to the fullest extent permitted by law.**

The only plaintiffs before this Court are Mr. Skirchak and Mr. Aldrich, both highly educated human resources professionals, who have not claimed anywhere in the record that the class

---

[7]     This directive clearly informs Plaintiffs of the importance of the DRP, and their role in commenting on it and participating in its roll-out to other employees.

action waiver was confusing to them.  Indeed, their subsequent actions show that they understood the meaning and impact of the entire DRP.  (Skirchak Affidavit, ¶ 5; Campion Affidavit, Exhibit 3).  The Plaintiffs in this case clearly had actual notice of the implementation and terms of the DRP.

> **3.    The Court misconstrues Massachusetts law regarding the effect of continued employment in establishing a contractual commitment.**

The law in Massachusetts is clear:  An employee's <u>continuing</u> to work after learning of the implementation of a dispute resolution program constitutes an acceptance of the terms of the program and shows an intent to be bound by the program.  *See O'Brien v. New England Telephone & Telegraph Co.*, 422 Mass. 686, 691 (1996); *Hightower v. GMRI Inc.*, 272 F.3d 239, 242-43 (4th Cir. 2001), cited in *Campbell*, 407 F. 3d at 558.[8]  The Court cites this precedent, but dismisses it by concluding that since neither Mr. Skirchak nor Mr. Aldrich had notice of the DRP before they showed up for work on December 1, 2003, they could not be bound by it.  Even if they did not have actual or inquiry notice before December 1, 2003 - - which the record establishes is not true - - they are still bound by the terms of the DRP by <u>continuing</u> to be employed thereafter, at a time when they indisputably had full knowledge of the DRP and its impact.  *See id.*  The DRP specifically provides that "employment on or <u>continued</u> <u>employment</u>

---

[8]    In *Hightower*, the employee claimed that he was not required to follow his employer's dispute resolution policy (which required, among other things, peer review, mediation, and ultimately, arbitration, if necessary), and filed suit in court.  *See Hightower*, 272 F.3d at 239.  The District Court refused to compel arbitration, but was reversed on appeal.  *Id.* at 243.  The Circuit Court held that the employee was bound to follow his employer's dispute resolution policy because he continued to work for the employer for three months following receipt of notice of implementation of the policy, and, in fact, attempted to use it himself to redress a grievance.  *Id.* at 243.  In that case, the policy was implemented on August 3rd and the employee continued working after its implementation.  *Id.* at 241.  The court wrote that "by continuing employment with GMRI for three months after he knew that the terms of the DRP would apply to him, Hightower demonstrated acceptance of the DRP."  *Id.* at 243.  In so holding, the court referred to a North Carolina state court decision, *Howard v. Oakwood Homes Corp.*, 516 S.E. 2d 879 (N.C. Ct. App. 1999), in which the court found that the employee's continuing in the employ of the employer for three months after the effective date of the employer's dispute resolution program, and her use of that program, constituted assent to the program even though she never signed an agreement.  Thus, the relevant authority—even the cases cited by the Court in its Order—hold that it is <u>continued</u> <u>employment</u> <u>after</u> <u>notice</u> of the DRP that is the key fact.

after" December 1st "constitutes consent" to the DRP. Such <u>continued</u> <u>employment</u> does

constitute consent as a matter of law in Massachusetts. *O'Brien*, 422 Mass. at 691. Thus,

Skirchak and Aldrich consented to the terms of the DRP by continuing their employment for

many months following their actual notice of such terms. That is why they are bound, not

because they were employed on December 1, 2003. If Mr. Skirchak or Mr. Aldrich did not want

to be bound by the DRP, they could have avoided the DRP by simply quitting. They had that

choice. They remained in the employ of DRC, doing their jobs, being paid very well for doing

so, and, in the course of those jobs, even seeking to use the DRP. *See O'Brien*, 422 Mass. at

695-96 (Plaintiff used grievance procedure against employer; cannot therefore avoid use of that

procedure and proceed to court); *Hightower*, 272 F.3d at 243. As Mr. Aldrich wrote to a fellow-

employee in July, 2004, "As employees of the company, <u>we</u> have agreed to follow this policy…"

(Campion Affidavit, Exhibit 3) (emphasis supplied). How could the plaintiffs' understanding

that by <u>continuing</u> as employees of the company, they are bound by the terms of the DRP, be any

clearer?

     For all of these reasons, it is respectfully submitted that the Court's determination that the

class action waiver is procedurally unconscionable is not supported by the facts in the record, or

the applicable law as applied to the facts, and should be reconsidered and reversed.

## POINT II

### THE COURT'S CONCLUSION THAT THE CLASS ACTION WAIVER IS SUBSTANTIVELY UNCONSCIONABLE IS CONTRARY TO THE GREAT WEIGHT OF AUTHORITY.

**1.     The Vast Majority of Courts Have Upheld Class Action Waivers in the FLSA and Other Contexts.**

     Every federal court which has considered the question of the enforceability of class

action waivers in Fair Labor Standards Act cases, has upheld such provisions as <u>not</u>

substantively unconscionable.   In doing so, these various courts have considered the arguments made by plaintiffs in this case, and the bases on which the Court made its decision here, and have rejected those arguments.   The Plaintiffs have yet to provide the Court with a single case in which a court has broken from this body of law and invalidated a class waiver in the FLSA context.   The Circuits below have ruled that waivers of class claims under the FLSA are valid:

**Fourth Circuit:**

> *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 502-3 (4th Cir. 2002) (compelling arbitration of FLSA claims pursuant to an agreement waiving the right to a class action).

**Fifth Circuit:**

> *Carter v. Countrywide Credit Indust., Inc.*, 362 F.3d 294, 298 (5th Cir. 2004) (affirming the validity of a waiver of collective action under the FLSA).

**Ninth Circuit:**

> *Horenstein v. Mortgage Market, Inc.*, 9 Fed. Appx. 618, 619 (9th Cir. 2001) (stating in the FLSA context "[a]ppellants' contention that the arbitration clause in the employment Agreements may not be enforced because it eliminates their statutory right to a collective action, is insufficient to render an arbitration clause unenforceable").[9]

**Eleventh Circuit:**

> *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1378 (11th Cir. 2005) (stating that the defendant's dispute resolution program's "prohibition of class actions and discovery limitations are consistent with the goals of 'simplicity, informality, and expedition' touted by the Supreme Court in *Gilmer*").

DRC is unaware of any court that has invalidated a waiver of a right to bring a class action FLSA claim on unconscionability grounds.   Plaintiffs have only submitted a few cases in which courts have expressed disfavor with class action waivers or invalidated such waivers, but

---

[9]    This decision is an unpublished opinion, but DRC brings it to the Court's attention because it is the only 9th Circuit case found by DRC addressing the issue of class action waivers in the FLSA context.   DRC has attached a copy of the opinion for the Court's convenience hereto as Exhibit A.

none of these cases are in the FLSA context.  There is not a single case of which DRC is aware, that supports the notion that waivers of FLSA class actions are unenforceable.

Further, the support for class actions waivers is not limited to the FLSA context.  Courts in numerous jurisdictions have enforced class action waivers in various contexts.  For example:

**Second Circuit:**          **Sherman Anti-Trust Act, Connecticut Anti-Trust Act, Connecticut Unfair Trade Practices Act contexts**

>   *JLM Indus. v. Stolt-Nielson S.A.*, 387 F.3d 163, 180 (2nd Cir. 2004) (stating that "federal courts have…consistently enforced arbitration provisions in the context of class action lawsuits where federal statutory claims have been at issue") (internal citations and quotations omitted).

**Third Circuit:**          **Truth-in-Lending Act context**

>   *Johnson v. West Suburban Bank*, 225 F.3d 366, 371 (3d Cir. 2000) (stating that "[t]he 'right' to proceed as a class action, insofar as the TILA is concerned, is a procedural one that arises from the Federal Rules of Civil Procedure").

**Fourth Circuit:**          **Truth-in-Lending Act, RICO, Maryland law contexts**

>   *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 638 (4th Cir. 2002) ("We also reject [the plaintiff's] argument that the Arbitration Agreement is unenforceable as unconscionable because without the class action vehicle, she will be unable to maintain her legal representation given the small amount of her individual damages").

**Sixth Circuit:**          **Truth-in-Lending Act, RICO, Kentucky law contexts**

>   *Burden v. Check into Cash of Kentucky, LLC*, 267 F.3d 483 (6th Cir. 2001) (suggesting that class action waivers of claims brought under the Truth-in-Lending Act, RICO and Kentucky law are valid).

**Seventh Circuit:**          **Distributorship context**

>   *Caudle v. American Arbitration Association*, 230 F.3d 920, 921 (7th Cir. 2000) ("A procedural device aggregating multiple persons' claims in litigation does not entitle anyone to be in litigation; a contract promising to arbitrate the dispute removes the person from those eligible to represent a class of litigants").

**Colorado:**             **Insurance context**

   *Rains v. Found. Health Sys. Life & Health*, 23 P.3d 1249, 1253 (Ct. App. Colo. 2001) ("arbitration clauses are not unenforceable simply because they might render a class action unavailable").

**Florida:**             **Consumer context**

   *Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1025 (Fla. Ct. App. 4th Dist. June 15, 2005) (enforcing a class waiver and stating "there are numerous enforcement mechanisms which can protect consumers other than class actions").

**Hawaii:**             **Employment discrimination context**

   *Brown v. KFC Nat'l Mgmt Co.*, 921 P. 2d 146, 166 (Haw. 1996) (rejecting an argument that arbitration was unfair because of the "alleged elimination of the opportunity for class actions" and quoting *Gilmer*, "even if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator,…arbitration agreements [do] not preclude [the relevant governmental agency, if any] from bringing actions seeking class-wide and equitable relief").

**Illinois:**             **Consumer context**

   *Rosen v. SCIL, LLC and Saks Inc.*, 799 N.E. 2d 488, 494-5 (Ill. App. 2003) (class action waiver was not unconscionable under Illinois law).

**New Jersey:**             **Consumer loan context**

   *Gras v. Assocs. First Capital Corp.*, 786 A.2d 886, 893 (N.J. App. Div. 2001) (enforcing class action waiver in an arbitration agreement after finding that there was no "legislative mandate or overriding public policy in favor of class actions").

**New York:**             **Consumer context**

   *Ranieri v. Bell Atlantic Mobile*, 304 A.D. 2d 353, 354 (N.Y. App. Div. 1st Dep't 2003) (class action waiver contained in an arbitration agreement is not unconscionable nor contrary to public policy).

**North Dakota:**             **Consumer (credit card) context**

   *Strand v. U.S. Nat'l Bank, N.A.*, 693 N.W. 2d 918, 926 (N.D. 2005) (validating a class action waiver and stating "Merely restricting the availability of a class action is not, by itself, a restriction on substantive remedies. The right to bring an action as a class action is purely a procedural right").

This is just a sample of the overwhelming authority that has upheld the validity of class action waivers in a wide variety of contexts. There are numerous other cases that enforce class waivers contained in arbitration agreements.

The First Circuit, in *Kristian v. Comcast Corp.*, 2006 U.S. App. LEXIS 9881, (1st Cir. Apr. 20, 2006), recently examined the enforceability of a class action bar in the context of an anti-trust case. There, the Court did not consider the issue from an unconscionability point of view, but instead focused on whether the cost of bringing an anti-trust action as individuals, rather than as members of a class, could effectively prevent them from vindicating their statutory rights under the Clayton Act and Massachusetts' anti-trust law in arbitration. *Id.* at *103. The Court looked to the enormous complexity and attendant costs of prosecuting anti-trust litigation, and concluded that because of the huge costs involved in that type of case, barring a class action would effectively prevent the employees from vindicating their rights under the anti-trust laws. *Id.* at *86-8. In doing so, the Court distinguished the case before it from several others in which class action waivers had been upheld, relying, in part, on the difference in complexity and costs between certain consumer class actions and very complex anti-trust cases. *Id.* at *91. Importantly, the cost of prosecuting the case was a fact supported by substantial evidence in the record--described as "unopposed expert declarations"--offered by the plaintiffs. *Id.* at *75.

This is a very different case and factual record from *Kristian* in several respects. First, this is not a complex anti-trust case. None of the complex economic issues, which are typical in an anti-trust action, requiring extensive and expensive expert witness fees, are present here. Second, there is no evidence in this record regarding the cost of prosecuting this case. As the Court wrote in *Kristian*, plaintiffs "bear the burden of showing the likelihood of incurring such costs," and "a showing by the plaintiff of silence on costs does not meet the plaintiff's burden."

*Id.* at \*65-6 quoting *Greentree Fin. Corp.-Alabama and Greentree Fin. Corp.*, 531 U.S. at 92.

Third, any concern about costs is obviated by the facts of this particular case,[10] including the

following facts in the record:

- Both Mr. Skirchak and Mr. Aldrich made a great deal of money working for DRC: each earned in excess of $100,000 per year. Individually, and certainly together, they could easily afford the cost of pursuing their FLSA claims. The whole purpose of the DRP was to resolve workplace claims "at the lowest level possible with minimal disruption or expense to either the employee or the company," according to Mr. Aldrich in his July 1, 2004 e-mail. (Campion Affidavit, Exhibit 1).[11]

- In that regard, it must not be forgotten that before a dispute reaches arbitration, there are two prior steps in the process – Management Review and Mediation – which would not be costly and may resolve the claim. The DRP provides, with respect to the first step, that the Management Review Process, which had been in place for some time prior to implementation of the DRP, "is expected, <u>as is</u> <u>the</u> <u>process</u> <u>now</u>, that most disputes can and probably will <u>continue</u> <u>to</u> <u>be</u> <u>resolved</u> through this process." (emphasis supplied). Under the DRP, DRC pays all of the costs of the Mediation process.

- If the matter does require individual arbitration under the DRP, the DRP provides that DRC will pay all of the costs of arbitration and up to $2,500 to each individual who chooses to arbitrate under the DRP for that individual's legal fees. The potential payment by DRC to these individuals (and their attorneys) if the case has not settled earlier using Steps 1 and 2 of the DRP could be $3,000,000.00 in the aggregate, depending on the number of people who desire to arbitrate. On the facts of <u>this</u> case, one cannot argue that it would be hard to find an attorney to represent individual DRC employees who choose to arbitrate.

- That conclusion is further bolstered by the fact that the DRP provides that the arbitrator has the power to award "reasonable attorney's fees as part of the award" to a "prevailing Employee." And, under 29 U.S.C. § 216(b), a plaintiff prevailing under the FLSA is awarded both attorney's fees and the cost of the action, even in arbitration. *Adkins*, 303 F. 3d at 502; *Snowden*, 290 F.3d at 638.

---

[10]   As the Court notes in its decision (on pages 6-7), the unconscionability analysis must be done on a case-by-case basis. The only plaintiffs before this Court are two senior, highly compensated individuals.

[11]   In *Adkins*, an FLSA case, as in *Kristian*, the court found that the plaintiff's cost arguments failed because the plaintiff there failed to sustain his burden of showing "the likelihood of incurring such costs." *See Adkins*, 303 F.3d at 502-03. One of the missing elements of the plaintiff's showing, the court said, was evidence of "the specific financial status of the plaintiffs at the time the action was brought." *Id.*

Those courts which have considered the enforceability of arbitration provisions as applied to class actions, and have examined the cost issues, have found less generous plans than the DRP enforceable as adequately dealing with cost concerns. *See e.g. Greentree Fin. Corp.-Alabama and Greentree Fin. Corp.*, 531 U.S. at 92 ("we believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs"); *Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 56-7 (1st Cir. 2002) (affirming the District Court's order compelling arbitration and holding that the employer's "offer to pay the costs of the arbitration and to hold the arbitration in the [plaintiff's] home state…mooted the issue of arbitration costs").[12]

Applying the required case-by-case analysis to <u>this</u> case, <u>these</u> plaintiffs and <u>this</u> DRP, and upon review of the existing precedent, it is clear that the class action waiver cannot be substantively unconscionable because the cost of these plaintiffs proceeding individually will not "effectively prevent" these employees from asserting any FLSA claims they may have.

The mere fact that an employer is unlikely to bring a class action against its employees cannot be a basis for concluding that the DRP is so one-sided as to be unconscionable. The truth is that there are many one-sided workplace rules which are routinely enforced: an employer's well-established right to search an employee's work station is not reciprocal; an employer has the right to change the terms and conditions of an employee's employment unilaterally at any time and the employee must comply or risk losing his job; employers have the unilateral right to

---

[12] One of the principal reasons for finding the arbitration agreement of *Circuit City* unconscionable in *Ingle v. Circuit City Stores*, 328 F.3d 1165, 1178 (9th Cir. 2003), which was not a FLSA case, was the fact that the costs of arbitration might be too great for an employee to bear. None of the offensive cost provisions present in that agreement are present in the DRP, in which DRC has agreed to pay <u>all</u> of the costs of arbitration, and a prevailing employee may be awarded his or her attorney's fees.

dictate what can and cannot be said or worn in the workplace.  There are dozens of other examples of this.  Given that employers have the right to dictate the terms and conditions of an employee's employment unilaterally, the dictating of these terms cannot be what is offensive. The issue, if one is looking at substantive unconscionability, has to be whether the effect of such terms and conditions interferes with some other protected right.

Here, the law is clear that the drafters of the FLSA did not choose to create an un-waiveable right to proceed in a class action, as the Court acknowledges in its Order on page 5. And on the fact of this case, there is no evidence in the record that enforcing a class action waiver will prevent DRC employees from seeking redress of alleged FLSA violations.

The fact that all of the costs associated with the DRP must be borne by DRC, also rebuts the Court's conclusion that there is no incentive for DRC to comply with the FLSA.  Moreover, it must not be forgotten that this is an employer who worked with the Department of Labor in the winter of 2004/2005, revised its policies to comply with the FLSA, and paid $76,855.46 to employees as part of this voluntary settlement.  DRC remains subject to the scrutiny of the Department of Labor, and this scrutiny is more than ample reason for DRC to comply with the FLSA.[13]  One cannot dismiss the effectiveness of this administrative agency in policing the conduct of employers and providing employees with an effective way to vindicate their rights. Thus, in this case, involving <u>this</u> employer, the concern for incenting <u>this</u> employer to comply with the FLSA is without foundation.

### 2.        The Court Misapplies the Unconscionability Standard.

The Court also uses the incorrect standard in analyzing substantive unconscionability. *See Rosenberg*, 170 F.3d at 17, citing *Gilmer*, 500 U.S. at 33.  "Absent a showing of fraud or

---

[13]     The Department of Labor has multiple remedies at its disposal, each of which acts as a coercive potential penalty to DRC and other employers, ensuring that they comply with the FLSA.  *See* 29 USC § 216.

oppressive conduct. . . the contract is not unenforceable on these [unconscionability] grounds. *Rosenberg*, 170 F.3d at 17.  There is no evidence of fraud or oppressive conduct anywhere in the record before this Court.

To the extent that the Court believes that the DRP was implemented to defeat the claims asserted in this action, that fallacy has no basis in fact in the record before the Court, as explained above.  DRC, in fact, followed its established, written procedures for implementing new policies.  The empirical and record evidence – the only evidence before the Court – is that the plaintiffs received <u>actual</u> <u>notice</u> of the implementation of the DRP, as early as November 14, 2003, that they understood it, and that they tried to use it themselves after it was implemented. Hence, there is no evidence of fraud or even surprise in the record before the Court.

As to "oppression," these plaintiffs should be estopped to make that argument.  Both of them tried to use the DRP as an employee (in Mr. Skirchak's case) and as a manager (in Mr. Aldrich's case).  Mr. Aldrich's July 1, 2004 e-mail shows that he did not regard the DRP as oppressive, and, in fact, understood and advocated that it was <u>beneficial</u> to DRP's workforce.  In any event, the DRP gives each employee an opportunity, without a formal legal process against his employer, to resolve disputes with "minimal disruption and expense."  DRC bears all of the costs of mediation and arbitration (if it is necessary) and also pays up to $2,500 to each employee who goes to individual arbitration in accordance with the DRP.  If the plaintiffs are successful, they can be awarded their attorney's fees by the arbitrator.  Applying the required case-by-case analysis to <u>this</u> DRP, there is no factual basis on which to conclude that the class action waiver in <u>this</u> case is oppressive to the plaintiffs or other DRC employees, or should be invalidated as substantively unconscionable.

## CONCLUSION

Based on the authorities cited herein, and the complete factual record before the Court, it is respectfully requested that the Court reconsider its decision and hold that the class action provision in the DRP is neither procedurally nor substantively unconscionable. To the extent that the Court relies on facts that are disputed in the record before it, DRC respectfully requests that the Court order an evidentiary hearing on those disputed fact issues.

<div style="margin-left: 50%;">

DYNAMICS RESEARCH CORPORATION,

By its attorneys,

*/s/ David S. Rosenthal*
David S. Rosenthal (BBO # 429260)
Carrie J. Campion (BBO # 656451)
Jeffrey B. Gilbreth (BBO # 661496)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
617-345-1000

</div>

Dated April 24, 2006

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each party by hand on April 24, 2006.

<div style="margin-left: 40%;">

/s/ Jeffrey B. Gilbreth
Jeffrey B. Gilbreth

</div>

# EXHIBIT A

LEXSEE 9 FED. APPX. 618

**JAY HORENSTEIN; KEVIN WASHINGTON, individually and on behalf of all persons similarly situated, Plaintiffs-Appellants, v. MORTGAGE MARKET, INC., an Oregon corporation; MARTY FRANCIS, Defendants-Appellees.**

**No. 99-36125**

**UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**

*9 Fed. Appx. 618; 2001 U.S. App. LEXIS 9267*

**December 13, 2000, Argued and Submitted, San Francisco, California; December 15, 2000, Submission Vacated; May 3, 2001, Submitted**
**May 10, 2001, Filed**

**NOTICE:** [**1] RULES OF THE NINTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Oregon. D.C. No. CV-98-01104-ALA. Ann L. Aiken, District Judge, Presiding.

**DISPOSITION:** AFFIRMED.

**COUNSEL:** For JAY HORENSTEIN, KEVIN WASHINGTON, Plaintiffs - Appellants: Phil Goldsmith, LAW OFFICE OF PHIL GOLDSMITH, Portland, OR.

For MORTGAGE MARKET INC., MARTY FRANCIS, Defendants - Appellees: Christopher R. Ambrose, Esq., AMBROSE LAW GROUP, Michael G. Hanlon, Esq., Portland, OR.

**JUDGES:** Before: FERGUSON, KLEINFELD and HAWKINS, Circuit Judges.

**OPINION:** [*618]

MEMORANDUM *

* This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as may be provided by Ninth Circuit Rule 36-3.

The Federal Arbitration Act ("FAA") applies to this case, *Circuit City Stores, Inc. v. Adams, 532 U.S. 105,* *149 L. Ed. 2d 234, 121 S. Ct. 1302 (2001),* and Section 16 [**2] of the FAA governs our jurisdiction. When a district court "has ordered the parties to proceed to arbitration, and dismissed all the claims before it, that decision is 'final' within the meaning of 16(a)(3), and therefore appealable." *Green Tree Financial Corp. v. Randolph, 531 U.S. 79, 121 S. Ct. 513, 521, 148 L. Ed. 2d 373 (2000).*

Appellants' argument that because the Arbitration Agreements specifically superseded all prior agreements, thus voiding the arbitration clause in their Employment Agreements, fails. The district court previously [*619] invalidated the Arbitration Agreements in their entirety, which appellants do not challenge. The appellants accordingly cannot rely on the invalidated supersession clause in this appeal. Moreover, we agree with the district court that it is inappropriate "to interpret the contract language in a manner contrary to the obvious intent of the parties that some type of arbitration apply."

We also reject appellants' contention that the Arbitration Agreements and the Employment Agreements were elements of one intertwined scheme, such that the arbitration clause should be struck under *Graham Oil Co. v. Arco Products Co., 43 F.3d 1244 (9th Cir. 1994).* [**3] The arbitration clause invalidated in Graham Oil was a "highly integrated unit" that represented "an integrated scheme to contravene public policy." *Id. at 1249.* The district court here voided the entire Arbitration Agreements, not merely the offensive provisions, specifically relying on Graham Oil's "integrated scheme" theory. The district court, however, properly refused to extend Graham Oil to the arbitration clause in the separate Employment Agreements. In Graham Oil, there was only one arbitration clause, a clause pervaded with illegality. Here there are two separate agreements, one of

which is pervaded with illegality; the other, standing alone, is a standard and inoffensive arbitration provision.

Appellants' contention that the arbitration clause in the mployment Agreements may not be enforced because it eliminates their statutory right to a collective action, is insufficient to render an arbitration clause unenforceable. See *Johnson v. West Suburban Bank, 225 F.3d 366, 370-71 (3d Cir. 2000)* (burden of establishing that Congress meant to preclude arbitration for a statutory claim rests on party seeking to avoid arbitration) ( [**4] citing *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 114 L. Ed. 2d 26, 111 S. Ct. 1647 (1991))*. While intent to preclude arbitration of a statutory claim may be found in the text of the statute, its legislative history, or in an inherent conflict between arbitration and the statute's underlying purposes, *225 F.3d at 371,* there is nothing in the text, and plaintiffs have shown nothing in the legislative history, indicating that Congress intended to preclude arbitration of FLSA claims. Although plaintiffs who sign arbitration agreements lack the procedural right to proceed as a class, they nonetheless retain all substan-

tive rights under the statute. *Id. at 373.* "Only those who consent to [] agreements with binding arbitration clauses are forced to abandon [a class action]; those who do not consent to arbitration in their contracts have the full selection of forums." *Id. at 378* (discussing Gilmer). The appellants here knowingly signed an agreement to arbitrate their statutory claims; accordingly, they abandoned their right to enforce those claims as part of a class action.

The appellants' FLSA claims are subject to arbitration. See *Kuehner v. Dickinson & Co., 84 F.3d 316, 319 (9th Cir. 1996).* [**5] The appellants' state law claims are also subject to arbitration. Oregon law contains a provision substantially identical to the FAA stating that arbitration agreements shall be "valid, irrevocable, and enforceable." *Or. Rev. Stat. § 36.305.* Appellants have pointed to no authority that claims founded in state statute are exempt from this rule.

AFFIRMED.