05-11362

# United States Court of Appeals
## For the First Circuit

Nos. 06-2136, 06-2180

JOSEPH SKIRCHAK on behalf of himself and all others similarly situated; BARRY L. ALDRICH, on behalf of himself and all others similarly situated,

Plaintiffs, Appellees/Cross-Appellants,

v.

DYNAMICS RESEARCH CORPORATION,

Defendant, Appellant/Cross-Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker, U.S. District Judge]

Before

Torruella, Lynch, and Howard, Circuit Judges.

David S. Rosenthal, with whom Carrie J. Campion, Jeffrey B. Gilbreth, and Nixon Peabody LLP were on brief, for Dynamics Research Corporation.

Martin J. Newhouse, Ben Robbins, and New England Legal Foundation on brief for New England Legal Foundation and Associated Industries of Massachusetts, amici curiae.

Shannon Liss-Riordan, with whom Hillary Schwab, Pyle, Rome, Lichten, Ehrenberg & Liss-Riordan, P.C., and Elayne N. Alanis were on brief, for Joseph Skirchak and Barry L. Aldrich.

John Roddy, Elizabeth Ryan, and Roddy, Klein & Ryan on brief for Public Justice, amicus curiae.

November 19, 2007

**LYNCH, Circuit Judge**. At issue is the enforceability under Massachusetts law unconscionability doctrine of class action waivers (of Fair Labor Standards Act claims) contained in a company-imposed arbitration/dispute resolution program.

Two managers brought a class action suit against their former employer, Dynamics Research Corporation ("DRC"), for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and the Massachusetts Minimum Fair Wage Law, Mass. Gen. Laws ch. 151, § 1 et seq.

The company moved to compel arbitration under its newly adopted Dispute Resolution Program ("Program") which contains language waiving class actions. The district court ordered arbitration and struck the class waiver provisions, finding them unconscionable and invalid as contrary to the policies animating the FLSA. Skirchak v. Dynamics Research Corp., 432 F. Supp. 2d 175 (D. Mass. 2006). The company has appealed the decision striking the class action waiver. The plaintiffs have agreed to arbitration but oppose waiver of their ability to pursue a class action in arbitration.

Based on the particular facts of this case, we uphold the striking of the class action waiver on grounds of unconscionability under state law and thus under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. Our ruling is narrow. We do not reach the argument that waivers of class actions themselves violate either

the FLSA or public policy. The question of whether plaintiffs otherwise meet the requirements for a class action are for the arbitrator to decide.

I.

A. Procedural History

Plaintiffs Joseph Skirchak and Barry Aldrich were employed by DRC, a government contractor of technology services. Skirchak worked in the Human Resources Department as the Director of Compensation and Retirement Programs until his resignation in October 2004; Aldrich was the Vice President of Contracts until his resignation in November 2004.

Following a complaint by Skirchak, the U.S. Department of Labor conducted an investigation into alleged violations of the FLSA in the fall of 2004. As a result, DRC agreed to pay back approximately $75,000 to its employees and change its policies. The plaintiffs then filed a class action complaint in the District of Massachusetts in June 2005 alleging violations of the FLSA and the Massachusetts Minimum Fair Wage Law and seeking treble damages. The complaint alleged that DRC willfully failed to pay plaintiffs, and all other similarly situated employees categorized as "exempt," at time-and-a-half of their regular pay rate for time worked in excess of forty hours per week in violation of federal and state law. Specifically, plaintiffs alleged that up until October 1, 2004, DRC's payroll department made partial-day deductions from

each employee's balance of paid leave and this violated the FLSA's salary basis test, resulting in underpayments that violated the FLSA and the Massachusetts Minimum Fair Wage Law. The plaintiffs' suit claimed damages beyond any relief obtained as a result of the Department of Labor investigation.

DRC never filed an answer, but instead moved to dismiss the complaint and compel arbitration in accordance with its 2003 Dispute Resolution Program, which, DRC contended, constituted an agreement between the parties to arbitrate all disputes. The Program, in certain clauses, required the plaintiffs to proceed in arbitration individually, as opposed to in a class action. The plaintiffs opposed the defendant's motion.

The district court, on April 6, 2006, issued an order compelling arbitration, but striking the part of the Program which barred class actions. Skirchak, 432 F. Supp. 2d at 181. The court found the class action waiver unconscionable under Massachusetts state law, finding procedural defects in the way it was adopted, that it was so one-sided as to be oppressive, and that the waiver was contrary to the purpose of the FLSA. Id. at 180-181. Both parties appealed: the defendant appealed the striking of the class action waiver, and the plaintiffs initially appealed the order compelling arbitration. The plaintiffs now agree to arbitration and argue only that the class action waiver is unenforceable.

B. The Dispute Resolution Program

We describe the essential facts surrounding the Program and its adoption. Roughly a year before the plaintiffs left the company, on Tuesday, November 25, 2003, at 11:42am, two days before the Thanksgiving holiday, DRC sent a five-line e-mail to all of its employees asking them to read three attached documents describing the company's new "Dispute Resolution Program". [The third attachment is not in the record and apparently is not in dispute.] Nothing in the e-mail mentioned that the attachments constituted modifications to the employees' terms of employment or employment contract, nor that the documents restricted the employees' rights to a judicial forum, nor that they waived class actions. Further, no response to the e-mail was required, nor were employees asked to acknowledge reading the documents.

The initial attachment, which appeared first after the body of the e-mail, contained a two-page memorandum introducing the Program. That memorandum explained that the Program took effect on the following Monday, December 1, 2003, and applied to all work-related disputes between the company and its employees. The memorandum stated that the Program "expands upon" and "enhance[s]" DRC's previous problem resolution process by requiring mediation and arbitration, described as "two additional and more formal processes for resolving disputes between an employee and the company." The "enhanced" Program would "create improved, reasoned,

predictable, and reliable processes" that would "provide the same resolution as can be obtained through the court system but with less cost and complications for all parties." Lastly, the memorandum reiterated that "[t]he program does not limit or change any substantive legal rights of our employees, but it does require that you seek resolution of such rights and complaints by following the procedures of the program." (Emphasis added.) This language is in some tension with later waiver language contained in the other attached documents. An employee who stopped after reading the descriptive memorandum would not know of the class action waiver.

A second attachment contained the actual text of the Program in four parts: a broadly-phrased, fifteen-page description of the Program, two appendices describing the Program's rules, and a third appendix containing relevant forms. The scope of the Program, by its terms, is broad and encompasses claims under federal and state employment statutes and matters of interpretation of the Program's rules. The Program applies to all "Disputes," defined as "any dispute for controversy including all legal and equitable claims, demands, and controversies, of whatever nature or kind, whether in contract, tort, under statute or regulation, or at law or in equity, between persons and entities bound by the Program . . . including, but not limited to, any matters with respect to . . . this Program . . . ." The Program also covers claims

premised on "allegations of[] discrimination based on race, sex, religion, national origin, or disability; sexual harassment; workers' compensation retaliation; [and] defamation . . . ." The Program also instructs the arbitrator to construe the scope of the Program liberally: "The arbitrator shall interpret and apply these Rules to the greatest extent possible insofar as they relate to the arbitrator's powers and duties." There is also a severability clause. Should a section or a provision of the Program be invalidated, the Program provides: "The invalidity or unenforceability of any provision herein shall not affect the application of any other provision or any jurisdiction in which such a provision may be lawful."

The fifteen-page Program description, plus its three Appendices, constitutes a thirty-three-page document. An employee who read only the e-mail, the descriptive memorandum and the fifteen-page Program description would not know of the class action waiver.

The two class action waiver clauses are contained in the Appendices to the Program. The first is in Appendix A, entitled "Dynamics Research Corporation's Dispute Resolution Program Rules." Rule 12 is entitled "Authority" and states: "<u>The Arbitrator shall have no authority to consider class claims or join different claimants or grant relief other than on an individual basis to the individual employee involved.</u> <u>The right of any party to pursue a</u>

class action for any Dispute subject to the Program shall be waived to the fullest extent permitted by law." (Emphasis added.) The language is some twenty pages into the thirty-three pages of the Program and the Appendices.

Later, in Appendix B, entitled "Dynamics Research Corporation's Dispute Resolution Program Arbitration Rules," there is a second waiver clause in Rule 30 ("Scope of the Arbitrator's Authority") on page 28 which provides that the arbitrator "shall have no jurisdiction to grant class relief . . . ." (Emphasis added.) This clause does not contain the limiting language "to the fullest extent permitted by law" contained in Appendix A. In order to find either of the provisions, the employee would have needed to read the initial five-line e-mail, the memorandum and the Program attachment, and to proceed to the pages in question.

A reader who read all of the attachments would likely still be confused because of tension between the wording of several clauses and documents. For example, one set of provisions provide for the preservation of all of the employees' rights and remedies. The last page of the Program description notes that an "arbitrator has the same authority as a judge or jury in making awards or granting relief to an individual employee."[1] A judge, in an

[1] At oral argument, defendant's counsel stated that this clause meant that an arbitrator could only grant relief to the individual employees whose individual claims were being arbitrated. An arbitrator would be powerless to grant broader relief, such as categorical job-description changes, unless all employees subject

appropriate case, may issue class-wide relief, while the second class waiver clause said an arbitrator had no such authority. To give another example, the first paragraph of Appendix A, in a section entitled "Purpose and Construction," states in part: "[The Program] is not intended either to abridge or enlarge substantive rights available under applicable law." In the same rule reiterating the class waiver on page 28, the Program also provides: "The arbitrator shall not have the authority to either abridge or enlarge substantive rights available under existing law." The Program's rules elsewhere state that "[o]ther than as expressly provided herein, the substantive legal rights, remedies, and defenses of all Parties are preserved."

Further, the reader would have to search to find that he or she had consented to the terms of the new Program by returning to work on the following Monday. While nothing is mentioned in the e-mail, the descriptive memorandum, or the document describing the Program, the final page of Appendix A provides that "[e]mployment on or continued employment after [December 1, 2003] constitutes consent by both the Employee and the Company to be bound by this Program . . . ."

By contrast, before the mass e-mail to all company employees on November 25, 2003, DRC had sent a similar e-mail to its general managers, including the two plaintiffs. That e-mail

---

to the job description were individually before the arbitrator.

contained an attached memorandum which informed the managers that the Program would be "mandatory" and "non-discretionary." This language was omitted from both the November 25 e-mail and the attached memorandum sent to all employees.

The company's later announcements to its employees also failed to disclose the class action waiver. The company's monthly newsletters in January, February, and November of the next year discussed the Program. Only the February 2004 article was explicit that lawsuits under the Program would be subject to a motion to remove the dispute from court. None of the newsletters described the class action waiver provision.

There is evidence that the method by which the Program was announced and adopted varied from the company's usual practices. Unlike the Dispute Resolution Program at issue in this case, which was only featured in the newsletter <u>after</u> it became effective, a "New Compensation Program" was announced in the January 2004 newsletter before its effective date of February 1, 2004. That newsletter also discussed plans to schedule "employee Compensation Program Orientation Sessions" to explain the New Compensation Program.

While DRC routinely communicated with employees about new policies using e-mails and, at times, after-the-fact articles in the newsletter, the company also sent personalized letters to the homes of employees, ran training programs, and made announcements

at employee meetings when it implemented new retirement programs. As to its Code of Conduct, the company also required employees to sign an annual acknowledgment that they had received and read the distributed materials.

There was no evidence from DRC that it had ever adopted and implemented any significant personnel policy, much less a significant one involving waiver of rights, by an e-mail to employees shortly before a holiday, and to which the employees were deemed to have agreed by returning to work after the holiday.

II.

A. Appellate Jurisdiction

Plaintiffs' brief argues that this court lacks appellate jurisdiction over DRC's appeal. Plaintiffs have most likely waived the argument by later asking this court to decide the class action waiver question. In any event, this court has jurisdiction to review the district court's order under the FAA, which grants appellate jurisdiction for "a final decision with respect to an arbitration that is subject" to the FAA. 9 U.S.C. § 16(a)(3). Plaintiffs had argued that the District Court's ruling compelling arbitration was not "final" because the American Arbitration Association Rules provide parties with the opportunity to seek court intervention at points before the conclusion of the arbitration. However, "the District Court has ordered the parties to proceed to arbitration, and dismissed all the claims before it,

[so] that decision is 'final' within the meaning of § 16(a)(3), and therefore appealable." Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 89 (2000); see also Municipality of San Juan v. Corporación para el Fomento Económico de la Ciudad Capital, 415 F.3d 145, 148 (1st Cir. 2005). The potential for future court intervention does not change the construction of "final" as set forth in Green Tree Fin. Corp.-Ala., 531 U.S. at 89.

B. Who Should Decide the Question

Both parties agree that this case should proceed in arbitration. Their disagreement is whether plaintiffs are barred from pursuing a class action in arbitration. The parties have requested this court to decide the issue and not refer it to the arbitrator.

Under the language of the Program, the question here ordinarily would be one for the arbitrator in the first instance for two different reasons. First, the arbitrator must construe all of the language to determine whether there was a waiver, in light of the tensions in the language as described. Second, an arbitrator could carry out the unconscionability analysis.

First, the Supreme Court's decision in Green Tree Financial Corp. v. Bazzle, 539 U.S. 444 (2003), made clear that when claims are submitted to arbitration, the question of whether

class arbitration is forbidden is not a question of arbitrability,[2] but initially a question of contract interpretation and should be decided in the first instance by an arbitrator. Id. at 447 (plurality opinion); see also id. at 455 (Stevens, J., concurring in the judgment and dissenting in part) (noting that the question "[a]rguably . . . should have been made in the first instance by the arbitrator"). "[T]he question is not whether the parties wanted a judge or an arbitrator to decide whether they agreed to arbitrate a matter. Rather the relevant question here is what kind of arbitration proceeding the parties agreed to." Id. at 452 (plurality opinion) (internal citations omitted); see also PacifiCare Health Sys., Inc. v. Book, 538 U.S. 401, 406-07 (2003) (holding that an arbitrator must decide whether statutory treble damages count as "punitive" within the meaning of an arbitration agreement).

This court adhered to that view in Anderson v. Comcast Corp., 500 F.3d 66 (1st Cir. 2007), which held that an arbitrator must decide whether a class action waiver extended to cover the suit in question under the language in the agreement. The relevant

---

[2] In Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79 (2002), the Supreme Court explained that "whether the parties have submitted a particular dispute to arbitration, i.e., the 'question of arbitrability'" is a question for the court, but "'procedural' questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide." Id. at 83-84 (internal quotation marks omitted) (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557 (1964)).

arbitration agreement there provided for waiver of class actions "unless your state's laws provide otherwise." Id. at 72. It was up to an arbitrator to determine whether a class action right provided by Massachusetts law fell into the exception provided by that arbitration agreement. Id.

Second, there is a separate but related question of whether, assuming the contractual language is interpreted to provide for a class action waiver, that waiver is unconscionable. Under Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46 (2006), it is likely that this question of the unconscionability of the class action waiver provision, viewed as severable from the arbitration provision, is an issue for the arbitrator. We need not resolve the issue.

Nonetheless, here the parties have affirmatively stated their intention that the court decide the unconscionability and statutory invalidity questions. We understand them to agree that the clauses should be assumed to be read to waive class claims, and the question of whether the Program, so read, may be enforced under the FAA is for the court.

The parties agree there is no jurisdictional objection to our deciding the question. An agreement to arbitrate does not divest a court of its jurisdiction. See DiMercurio v. Sphere Drake Ins., PLC, 202 F.3d 71, 77 (1st Cir. 2000) (noting the "modern view that arbitration agreements do not divest courts of jurisdiction,

though they prevent courts from resolving the merits of arbitrable disputes").

We have jurisdiction and, in the interests of efficiency, we reach the merits question, as requested.

We review the district court's decision de novo, as it presents solely questions of law. Anderson, 500 F.3d at 71; see also Marks 3 Zet-Ernst Marks GmBh & Co. KG v. Presstek, Inc., 455 F.3d 7, 13 (1st Cir. 2006). The facts on which we rely are undisputed; there are some disputes as to facts which are not material. We may affirm the district court order on any independent ground made manifest by the record. InterGen N.V. v. Grina, 344 F.3d 134, 141 (1st Cir. 2003).

C. The Merits: Enforceability of the Waiver Clause

This case, then, does not involve an attempt to avoid arbitration at all, but only avoidance of a class waiver. The case does not call for invocation of much of the Supreme Court case law originally designed to counter judicial hostility to arbitration. See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 n.14 (1985) ("[T]he [Federal Arbitration] Act was designed to overcome an anachronistic judicial hostility to agreements to arbitrate . . . ."); Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983) (the Federal Arbitration Act reflects "a liberal federal policy favoring arbitration agreements . . ."). Nor does the issue here invoke

more recent case law designed to prevent judicial incursions into the power of arbitrators to decide matters which the parties intended the arbitrators to decide. See Green Tree, 539 U.S. at 447.

Both the law of arbitration and the law of contracts set forth conditions under which a clause in such a contract may not be enforced, such as unconscionability. See 9 U.S.C. § 2 (written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"); see also Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687 (1996) (noting that "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2"); Kristian v. Comcast Corp., 446 F.3d 25, 63 (1st Cir. 2006).

The issues in the case not only draw on the law of contracts, but also are akin to issues under the law of waiver of rights granted under federal employment statutes. That law focuses largely on whether the waiver was knowing and voluntary. See, e.g., Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8-9 (1st Cir. 2007) (finding that an employee's severance agreement constituted a knowing and voluntary waiver of Title VII rights); Rivera-Flores v. Bristol-Myers Squibb Caribbean, 112 F.3d 9, 12-14 (1st Cir. 1997) (finding that an employee's severance agreement

constituted a knowing and voluntary waiver of ADA rights); Smart v. Gillette Co. Long-Term Disability Plan, 70 F.3d 173, 181-83 (1st Cir. 1995) (finding that an employee's severance agreement constituted a knowing and voluntary waiver of her ERISA rights). Congress has, through the Older Workers Benefit Protection Act, legislatively required that waivers of ADEA rights be knowing and voluntary. 29 U.S.C. § 626(f)(1). No such express statutory protection applies to waivers under the FLSA. So we consider the issues of knowledge and voluntariness insofar as they are pertinent under the state law doctrine of unconscionability.

Unconscionability and related doctrines do not turn on whether, in a strict sense, a party has a constitutional, statutory, or common law "right." The FLSA does provide that actions for FLSA violations may be brought as class actions. 29 U.S.C. § 216(b). This congressional allowance for class actions recognizes that class actions may be the more effective mechanism for redressing small claims, see Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 338 (1980) (noting that "the class-action . . . may motivate [plaintiffs] to bring cases that for economic reasons might not be brought otherwise"), and permit citizens to function as private attorneys general.[3] The Supreme Court has noted that

---

[3] No issue is raised about the effect of the agreement on the Department of Labor as a public enforcement agency. See EEOC v. Waffle House, Inc., 534 U.S. 279 (2002) (holding that an employer cannot preclude a public enforcement agency from bringing an enforcement action for employee-specific relief by relying on an

the FLSA itself is meant to offset the superior bargaining power of employers both for particular employees at issue and broader classifications, and to offset the resulting general downward pressure on wages in competing businesses. See Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 302 (1985).

For our purposes, it is not important to answer whether the FLSA gives plaintiffs a "right" to a class action in the same way one has a right to file suit under the FLSA. It is sufficient that the class action provisions give the plaintiffs an interest of some value to them in their employment.[4]

State law, under the provisions of the FAA, provides our reference point. See 2 Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law 2988-89 (4th ed. 2007) ("The enforceability of employer-imposed arbitration agreements depends on the governing state's contract law and the facts of the individual cases, including the prominence and clarity of the employer-employee arbitration agreement).

---

[4] DRC argues that the company's assumption of the costs of mediation and arbitration, reimbursement of legal costs up to $2,500 to each employee who wishes to arbitrate, the mutuality of the obligation to arbitrate, and the ease and speed of arbitration suffice to provide adequate consideration. These are very good arguments for consideration for arbitration; they do not foreclose analysis of whether the waiver of class actions in arbitration, a further step, is its own protectable interest subject to unconscionability analysis. The Program itself provides for severability. See also Waters v. Min Ltd., 587 N.E.2d 231, 233 (Mass. 1992) (noting that "[g]ross disparity in the values exchanged is an important factor to be considered in determining whether a contract is unconscionable").

arbitration agreement, whether the employee acknowledged the arbitration requirement, whether the employee had a 'meaningful choice,' and whether the employee was well-educated." (footnotes omitted)).

Plaintiffs argue the application of normal state law unconscionability analysis should be heightened somewhat because the FLSA is a federal statute protecting employee rights. Under Title VII and the ADA, we have applied an independent federal scrutiny of the adequacy of the notice of waiver of judicial rights because in the language of these statutes Congress referred to "appropriate" waivers.[5] Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 20 (1st Cir. 1999) (Title VII); Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 554-55 (1st Cir. 2005) (ADA). No "appropriateness" requirement exists in the FLSA, and we reject the argument.

Rather, under the FAA, we approach this issue under normal state law unconscionability standards; here, we apply those of Massachusetts. In Miller v. Cotter, 863 N.E.2d 537 (Mass. 2007), the Massachusetts Supreme Judicial Court ("SJC") laid out its present standard for unconscionability as a defense to

---

[5] Both Title VII and the ADA expressly cabin their endorsements of arbitration in cases covered by those statutes by providing that "[w]here appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including . . . arbitration, is encouraged." Civil Rights Act of 1991, Pub. L. No. 102-166, § 118, 105 Stat. 1071, 1081 (Title VII); 42 U.S.C. § 12212 (ADA).

enforcing all or part of an arbitration agreement. Miller involved an agreement to arbitrate (but not a class action waiver) signed along with a contract for admission of a patient to a nursing home. The court found that the agreement was not unconscionable, and set forth a standard of case-by-case determination, looking at the "setting, purpose, and effect" of the agreement.

> "The determination that a contract or term is or is not unconscionable is made in the light of its setting, purpose and effect." Restatement (Second) of Contracts § 208, comment a (1981). "Because there is no clear, all-purpose definition of 'unconscionable,' nor could there be, unconscionability must be determined on a case by case basis (see Commonwealth v. Gustafsson, 370 Mass. 181, 187 [346 N.E.2d 706 (1976)]), giving particular attention to whether, at the time of the execution of the agreement, the contract provision could result in unfair surprise and was oppressive to the allegedly disadvantaged party" (emphasis added). Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 292-293, 408 N.E.2d 1370 (1980).

Id. at 545. In giving further content to the agreement's "setting," the SJC examined several factors, including: (1) the plaintiff's education and business sophistication, (2) the circumstances under which the plaintiff entered into the agreement, and (3) any pressure that was exerted by the defendant on the plaintiff. Id. The court noted that the "arbitration agreement . . . was separate from and independent of the admissions agreement, and explicitly not a condition of admission." Id. at 546. The defendant "did not exert any undue pressure on him to

sign it," id. at 545, and the agreement "was adequately explained in an extended admissions meeting" with the plaintiff. Id. at 546. The SJC also found nothing objectionable about the agreement's "purpose and effect."[6] Id. at 545.

For a variety of reasons, we conclude that the waiver clause, under these circumstances, is unenforceable under state law. We do not need to reach the question of whether the waiver's purpose and effect is independently objectionable. Under state law, whether an enforceable contract exists, as in the case of whether an employment handbook is a contract, "depends upon a host of considerations, including its content and the circumstances of its distribution." Campbell, 407 F.3d at 559 (citing O'Brien v. New Eng. Tel. & Tel. Co., 664 N.E.2d 843, 847-49 (Mass. 1996)). Further, under state law, when waiver of statutory rights is at issue, Massachusetts generally requires that the waiver be both knowing and voluntary. See, e.g., Barton v. Brassring, Inc., 2006 WL 3492161, at *3 (Mass. Super. Ct. Oct. 26, 2006); Rowe v. Town of North Reading, 2001 WL 170655, at *7 (Mass. Super. Ct. Jan. 5,

---

[6] The SJC noted the federal and state policies favoring arbitration and that the agreement was bilateral, in that either party was compelled to bring claims in arbitration. Miller, 863 N.E.2d at 545. The court further noted that "[a]ll rights and remedies available in courts were preserved for the arbitrator, and [that] Miller had a unilateral right of recision for thirty days after execution of the agreement." Id. The agreement in this case, by contrast with the one before the SJC in Miller, does not preserve all judicial procedures and remedies, nor did employees have a unilateral right of rescission.

2001). In our view, this stautorily created interest in class actions, even assuming it is waivable, was sufficiently strong that Massachusetts law would, on these facts, find the waiver would result in oppression and unfair surprise to the disadvantaged party. The waiver was not due to mere allocation of risk because of DRC's superior bargaining power.[7] Waters, 587 N.E.2d at 233.

It is the combination of a series of events which leads us to a conclusion of unconscionability; no single event alone bears the weight of this conclusion and no broader implications should be taken from this opinion.

The timing, the language, and the format of the presentation of the Program obscured, whether intentionally or not, the waiver of class rights. The waiver lacked both prominence and clarity. Massachusetts courts, under another fairness doctrine, have declined to enforce clauses due to short timing (here, the short notice over a holiday weekend). See, e.g., Cherick Distribs., Inc. v. Polar Corp., 669 N.E.2d 218, 220 (Mass. App. Ct. 1996) (upholding finding that termination of a contract with only four days' notice was a breach of the implied covenant of good faith and fair dealing); Williams v. B & K Med. Sys., Inc., 732

---

[7] DRC, appropriately, has not argued it can impose any term of employment it wants in any manner it chooses. In fact, Massachusetts law imposes a covenant of good faith and fair dealing in employment contracts. See Harrison v. NetCentric Corp., 744 N.E.2d 622, 629 (Mass. 2001) (citing Fortune v. Nat'l Cash Register Co., 364 N.E.2d 1251, 1256-58 (Mass. 1977)).

N.E.2d 300, 305 (Mass. App. Ct. 2000) (upholding a finding that refusal to allow an employee time to consider a severance offer as a violation of the implied covenant of good faith and fair dealing).

There was nothing objectionable about the use of e-mail itself. But the content, the obscurity, and the timing of the e-mail and the failure to require a response raise unconscionability concerns. The e-mail employees received the Tuesday before Thanksgiving did not state it represented a modification to their employment contract at all. To the contrary, the attached memorandum clearly noted that the Program "d[id] not limit or change any substantive legal rights of [DRC's] employees." It also described the Program as an "enhanced program" with the intent "to create improved, reasoned, predictable, and reliable processes . . . ," without mention of any potential disadvantages. The memorandum also failed to give notice.

We do not decide whether it was the <u>intent</u> of the company to hide the waiver. The effect was to hide the waiver. Massachusetts law considers the risk of misrepresentation in assessing unconscionability. <u>See</u> <u>Waters</u>, 587 N.E.2d at 234 ("[M]isrepresentation [is] recognized as [a] factor[] rendering a contract unconscionable."); <u>cf.</u> <u>Campbell</u>, 407 F.3d at 557-58 (noting that an e-mail describing arbitration as "a kinder, gentler alternative to litigation" without suggesting that it

"extinguish[ed] an employee's access to a judicial forum" did not "provid[e] fair warning that showing up for work the next day would result in a waiver of important rights").

Massachusetts law considers, as part of unconscionability analysis, whether the provision is "obscurely worded" or "buried in fine print" of a contract. Zapatha, 408 N.E.2d at 1377. The lack of fair notice here continued into the format of the presentation, as the class action waiver was hidden in two paragraphs in a multi-page appendix to a fifteen-page document. Cf. Campbell, 407 F.3d at 557 (recognizing it as a "fundamental flaw" when an e-mail announcement contained nothing to imply, nor did it "state directly that the Policy contained an arbitration agreement that was meant to effect a waiver of an employee's right to access a judicial forum").

Massachusetts law also considers whether there was an opportunity to consult or to signify acceptance of a contractual term where waiver of statutorily defined rights are involved. See Miller, 863 N.E.2d at 539, 545 (noting that the arbitration agreement required a separate signature, but was not a requirement for admission to the nursing home); Zapatha, 408 N.E.2d at 1377 (noting that the plaintiff had been given the opportunity to consult an attorney before accepting). Here, DRC did not require any sort of affirmative response or acknowledgment by the employee. Cf. Campbell, 407 F.3d at 557 (noting that the "'no response

required' format . . . disguised the import of the communication," while "[r]equiring an affirmative response . . . would have signaled that the Policy was contractual in nature").[8] This is just another factor in the mix.

DRC attempts to avoid the consequences of the choices it made which effectively hid the waiver provision with the argument that, by now, enough notice has been provided for the class waiver that the waiver is enforceable. DRC phrases the argument in terms of the fact that plaintiffs continued to work after the effective date of the announcement and certainly learned of the waiver. We reject the argument. Nothing would be left of much of state law unconscionability analysis if that argument were accepted. The Campbell analysis is directly to the contrary; it analyzed the procedures by which the arbitration agreement was communicated before it became effective, even when an employee worked at the company for twenty months after the agreement was adopted. 407 F.3d at 548-49, 559.

---

[8] Plaintiff Aldrich provided written comments on the Program to John Wilkinson, a DRC employee, on November 19, 2003. Defendant argues, with some reason, that this undercuts Aldrich's individual claim for lack of notice. That argument, though, is not available as to plaintiff Skirchak. And it is undisputed that Aldrich and Skirchak were on vacation over the period from November 25th to December 1st and would not have read the November 25th e-mail until they returned. Further, an objective and company-wide approach to notice is consistent with how this court handled the issue in Campbell. See Campbell, 407 F.3d at 555 (noting that "the sufficiency of the notice turns on whether, under the totality of the circumstances, the employer's communication would have provided a reasonably prudent employee notice of the waiver").

One additional factor in the mix is the comparison of how this program was handled with how the company handled other personnel issues. Plaintiffs point to two other programs which involved face-to-face training sessions, mailings to employees' homes, and announcements at company-wide meetings. DRC counters that these two other programs were the deviations from the standard procedure, and that the communication of this Program was the norm. For our purposes, it suffices that it was at least common practice, if not uniform practice, for DRC to employ methods of communicating policy changes that extended further than e-mail notifications before and newsletter articles after the fact. See Campbell, 407 F.3d at 557 ("[While] e-mail was a familiar format for many forms of intra-office communication, . . . [the record] does not suggest that e-mail was a traditional means either for conveying contractually binding terms or for effectuating waivers of employees' legal rights.").

We do not need to decide if class actions under the FLSA may ever be waived by agreement.[9] DRC strongly argues this point.

---

[9] The parties argue about the impact of language in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 32 (1991): "[E]ven if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that the [ADEA] provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred." (quoting Nicholson v. CPC Int'l Inc., 877 F.2d 221, 241 (3rd Cir. 1989) (Becker, J., dissenting) (internal quotation marks omitted).

This argument about unenforceability vel non of class waiver clauses under the FLSA stems from the recognition that

The cases on which DRC relies find class waivers to be insufficient grounds to invalidate an arbitration agreement in total. They are not so instructive on the issues we do reach, which turn on the facts of this case and not an attempt to invalidate the arbitration agreement. See Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1378 (11th Cir. 2005); Carter v. Countrywide Credit Indus., Inc., 362 F.3d 294, 298 (5th Cir. 2004); Adkins v. Labor Ready, 303 F.3d 496, 503 (4th Cir. 2002); Horenstein v. Mortgage Mkt., Inc., 9 Fed. Appx. 618, 619 (9th Cir. 2001) (unpublished per curiam order). We note there is also case law reaching the opposite result. See Shroyer v. New Cingular Wireless Servs., Inc., 498 F.3d 976, 984 (9th Cir. 2007) (using a finding that class action waiver was unconscionable under California law to invalidate an arbitration agreement); Powertel, Inc. v. Bexley, 743 So.2d 570, 576-77 (Fla. Dist. Ct. App. 1999) (using a finding that class action waiver was unconscionable under Florida law to invalidate an arbitration agreement).

---

parties to a pre-dispute arbitration agreement do not "forgo the substantive rights afforded by the statute; [they] only submit[] to their resolution in an arbitral, rather than a judicial, forum." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 123 (2001) (quoting Gilmer, 500 U.S. at 26) (internal quotation mark omitted). While the FAA is silent on questioning the effectiveness of the arbitral forum, Gilmer read into the FAA a test of whether a litigant "effectively may vindicate [his or her] statutory cause of action in the arbitral forum . . . ." Gilmer, 500 U.S. at 28 (quoting Mitsubishi, 473 U.S. at 637) (internal quotation mark omitted); see also Rosenberg, 170 F.3d at 11. These arguments go to the issue of whether waivers of class actions under the FLSA are inherently unfair or unenforceable, an issue we do not reach.

By like token, plaintiffs rely heavily on Kristian, 446 F.3d 25, which invalidated a prohibition against antitrust class action claims in an arbitration agreement. The Kristian holding rests on reasoning that the class action waiver constituted a weakening of antitrust law enforcement mechanisms in a manner inconsistent with congressional intent. Again, Kristian is pertinent to the questions we do not reach.

We also do not reach the question of whether such waivers of FLSA class actions are per se against public policy under either the FLSA or the Massachusetts Fair Wage Law.[10] See, e.g., Beacon Hill Civic Ass'n v. Ristorante Toscano, Inc., 662 N.E.2d 1015, 1018-19 (Mass. 1996) (contract in which neighborhood association promised not to oppose beer and wine license in exchange for promise of restaurant not to seek general alcohol license violates public policy); Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 533 N.E.2d 1368, 1371 (Mass. 1989) ("Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury).").

---

[10] We acknowledge the able amicus briefs filed on both sides, which largely go to the issue we do not reach: the validity per se of class action waivers under the FLSA.

We recognize that there is a policy debate about whether class action waivers essentially act as exculpatory clauses, allowing for violations of laws where individual cases involve low dollar amounts and so will not adequately address or prevent illegality.[11] See Myriam Gilles, Opting Out of Liability: the Forthcoming, Near-Total Demise of the Modern Class Action, 104 Mich. L. Rev. 373, 378 (2005) (arguing that "sound public policy requires collective litigation be available for small-claim plaintiffs who would not have the incentive or resources to remedy harms or deter wrongdoing in one-on-one proceedings"); David S. Schwartz, Enforcing Small Print To Protect Big Business: Employee and Consumer Rights Claims in an Age of Compelled Arbitration, 1997 Wis. L. Rev. 33, 37 (contending that "displacing adjudication through pre-dispute arbitration clauses systematically reduces the legal liability of corporate defendants").

The SJC has not addressed the issue and we have no need to predict what it would do.

---

[11] Plaintiffs point to the decision in Gentry v. Superior Court, 165 P.3d 556, 569 (Cal. 2007), which held, under California law, that a class action waiver is contrary to public policy when it would "weaken or undermine the private enforcement of overtime pay legislation by placing formidable practical obstacles in the way of employees' prosecution of those claims." Defendants respond that unlike Massachusetts, California applies a rebuttable presumption that pre-dispute arbitration agreements in the employment context are unconscionable. See Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1174 (9th Cir. 2003).

III.

At oral argument we asked the parties whether each would prefer to be in arbitration even if the class action waiver clause was stricken. The company said it would prefer to be in arbitration; the plaintiffs agreed. We have no reason to choose a different remedy. We affirm the district court's striking of the class action waiver and remand for further proceedings in accord with this opinion.